53 F.3d 332
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jason RONAYNE, and John LaBarrie, Defendants-Appellants.
 Nos. 94-1374, 94-1378.
 United States Court of Appeals, Sixth Circuit.
 May 2, 1995.
 
 Before: CONTIE, RYAN, and SILER, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Jason Ronayne appeals from his conviction of two counts of possession of cocaine with the intent to distribute, in violation of 21 U.S.C. Sec. 841(a); one count of carrying a firearm in relation to a Sec. 841(a) offense, in violation of 18 U.S.C. Sec. 924(c); and one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. Sec. 846. John LaBarrie appeals from his conviction of conspiracy to distribute cocaine, in violation of 21 U.S.C. Sec. 846.
 
 
 2
 Ronayne claims the district court 1) erred when it refused to give the jury an instruction on the defense of entrapment; 2) plainly erred when it failed to grant a mistrial based on the prosecution's conduct of investigating the criminal histories of the empaneled jury members; and 3) plainly erred when it allowed the prosecution to offer testimony regarding Ronayne's custodial statement that there was a gun in his jacket pocket when Ronayne had not been informed of his rights.
 
 
 3
 LaBarrie claims the district court 1) erred when it ruled that LaBarrie's inculpatory statement made to Agent Alcaro after he had been arrested was admissible; 2) plainly erred when it failed to rule that LaBarrie was prejudiced by the prosecution's delay in providing LaBarrie's counsel with notice of incriminating statements; 3) abused its discretion when it chose to remove Juror 202; and 4) erred when it refused to grant LaBarrie's motion for acquittal on the grounds of insufficient evidence to support the verdict.
 
 
 4
 Because we conclude that all these assignments of error are without merit, we affirm both defendants' convictions.
 
 I.
 
 5
 These convictions resulted from a DEA investigation of drug trafficking in Detroit, Michigan. Eric Ravitz was a confidential informant who was working with the DEA. Ravitz had a long-term relationship with Ronayne, who had sold Ravitz marijuana. Ronayne asked Ravitz if Ravitz knew anyone who would be interested in buying cocaine. Ravitz said that he did, and contacted DEA agent Robert Alcaro. Ravitz telephoned Ronayne and arranged for Agent Alcaro to buy an ounce of cocaine for $1300. On March 25, 1993, Ravitz and Alcaro met Ronayne and consummated the sale. Alcaro discussed future cocaine transactions with Ronayne.
 
 
 6
 Alcaro phoned Ronayne to set up the purchase of one kilogram of cocaine. Ronayne told Alcaro that the owner of the cocaine would be present for the transaction. On April2, 1993, one week after the first drug buy, Alcaro and Ravitz drove to Ronayne's house. Ronayne came out of the house and approached Alcaro's truck. Ronayne told Alcaro that he would bring out a small sample of the cocaine for Alcaro to inspect. He stated that he and the supplier would want to see the money at that time. Ronayne told Alcaro that after he and the supplier saw the money, they would produce the rest of the cocaine.
 
 
 7
 Ronayne went back to his house and, shortly thereafter, returned with LaBarrie. Ronayne showed Alcaro about four and one-half ounces of cocaine. Alcaro then showed the defendants some of his money, which was in a briefcase. LaBarrie was not satisfied with the amount Alcaro had shown him and demanded to see more. Alcaro then showed LaBarrie that the briefcase held four bundles of money, each containing $10,000. Ronayne and LaBarrie said they would shortly return with the cocaine.
 
 
 8
 Alcaro drove around with Ravitz for awhile and then pulled the truck up to the back of Ronayne's house. Ronayne, who was waiting outside, said he would return shortly with the cocaine. As Ronayne was approaching Alcaro's truck with the cocaine, but before he reached it, LaBarrie pounded on a back window to signal to Ronayne. Ronayne went back into the house. LaBarrie then drove away in his minivan.
 
 
 9
 Alcaro used his car phone to "beep" Ronayne, who came back out of the house as LaBarrie drove away. Ronayne said that LaBarrie had been concerned about a car that had been spotted in the neighborhood. After satisfying himself that the trash bag that Ronayne had brought with him contained cocaine, Alcaro gave the arrest signal to agents waiting nearby. When Ronayne spotted the approaching agents, he attempted to run. Alcaro identified himself and struggled with Ronayne; during the struggle, Ronayne's jacket came off. Other agents quickly tackled Ronayne and handcuffed him. The agent cuffing Ronayne, Robert Johnson, asked Ronayne ifhe was armed. Ronayne stated that there was a pistol in his jacket pocket.
 
 
 10
 Several weeks later, DEA agents, including Alcaro, went to LaBarrie's house to determine whether he was the man who had gotten away and, ifhe was, to arrest him. LaBarrie's mother answered the door and confirmed that her son matched the description of the man the agents were looking for. When LaBarrie came to the door, Alcaro recognized LaBarrie as the man who had been present at the drug transaction. Alcaro asked, "Do you remember me?" LaBarrie said he did and the agents arrested him. The agents told LaBarrie that he did not have to say anything to them, and that he would have an opportunity to talk to a lawyer. The government concedes that these warnings were not the complete warnings required by Miranda v. Arizona, 384 U.S. 436 (1966). The agents then explained to LaBarrie's mother why they were arresting her son. LaBarrie interrupted the agents while they were speaking to his mother and said: "I know Jason Ronayne. I know what it's all about. I really didn't say that much to you and I left before it was delivered." At trial, the district court ruled that the first statement, the affirmative response that LaBarrie remembered Alcaro, was not admissible, but that the second statement about leaving "before it was delivered" was admissible.
 
 II.
 
 11
 The defendants were indicted and tried together. During voir dire, the court asked the prospective jurors if they had ever had any contact with a criminal court either as a defendant, a victim, or a witness. Several jurors indicated that they had, and the court explored each case. Some jurors were referring to traffic infractions or other minor incidents. Juror 202 did not indicate that he had ever had any contact with a criminal court. The government used four of its five peremptory challenges; the defendants used all of their challenges. After the jury was empaneled, the trial prosecutors ran criminal record checks on the jurors to see whether any of them had lied during voir dire concerning their criminal history. The check indicated that at least one of the jurors may have had a criminal history that had not been revealed. The prosecutor asked the court to allow him to see the jury questionnaire responses because it was difficult to verify a criminal history check without knowing a person's age or address. The defendants objected to this request because it was "appalling" that the government would question the veracity of the jurors. The court granted the request. After studying the jury questionnaires, the prosecutor discovered that Juror 202 had an undisclosed criminal history. This person had been arrested in Oakland County, Michigan, and charged with a sexual assault felony. He eventually pleaded guilty to the misdemeanor charge of child abuse in the third degree.
 
 
 12
 The court questioned Juror 202 concerning his answer during voir dire, and the juror stated that he had misunderstood the court's question. He thought the court was asking only about felony convictions, and he had been arrested for a misdemeanor. The court, at first, stated that that was a reasonable mistake and admonished the juror not to discuss the matter with the other jurors. After reflecting further on the juror's answer, however, the court concluded that the juror had intentionally failed to disclose his criminal history. The court ruled that the government was prejudiced by the juror's nondisclosure because the government still had an unused peremptory challenge. The court decided to remove Juror 202 as an alternate and allowed the defendants to remove a juror of their choice. At the court's direction, the court and counsel went through the charade of a purported "blind draw" to ensure that the jurors did not know the circumstances of Juror 202's removal.
 
 
 13
 Ronayne was convicted of all four counts against him and was sentenced to 63 months imprisonment for the drug offenses, with a consecutive sentence of 60 months for using a firearm. LaBarrie was convicted of the one count against him and sentenced to 70 months imprisonment. This timely appeal followed.
 
 III.
 A.
 
 14
 Ronayne's first assignment of error is that the district court refused to instruct the jury on the defense of entrapment. The cooperating informant, Ravitz, testified that Ronayne approached him and asked if Ravitz knew anyone who would want to buy cocaine. Ronayne argues that ifthe jury disbelieved Ravitz's testimony, then itcould have concluded that the government had entrapped Ronayne.
 
 
 15
 "This court reviews the jury charge as a whole to determine whether it fairly and adequately submits the issues and the law to the jury." United States v. Newcomb, 6 F.3d 1129, 1132 (6th Cir. 1993). A district court's refusal to give a jury instruction is reversible error only if: 1) The refused instruction is a correct statement of the law; 2) the refused instruction is not substantially covered by other included instructions; and 3) the failure to give the refused instruction impairs the defendant's theory of the case. Id.
 
 
 16
 Importantly, "although a jury instruction should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation, so long as there is even weak supporting evidence, a trial court commits reversible error in a criminal case when it fails to give an adequate presentation of a theory of defense." Id. (internal quotations and citations omitted).
 
 
 17
 In Mathews v. United States, 485 U.S. 58 (1988), the Supreme Court reaffirmed its long-standing rule that the defense of entrapment has two elements: 1) the government induced the defendant to commit the crime, and 2) the defendant did not have a predisposition to commit the crime. Id. at 63. "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Id.
 
 
 18
 We conclude that the district court did not err in refusing to give the instruction on entrapment because there was no evidence at all that would indicate that Ronayne had been entrapped. Ronayne argues that if the jury disbelieved the informant Ravitz, then the jury could have believed that Ronayne had been entrapped. It is important to note that Ronayne admits that the testimony of Ravitz completely defeats his entrapment defense because Ravitz testified that Ronayne had been selling marijuana to him for a long time, and that it was Ronayne who first approached Ravitz with the suggestion of finding cocaine customers. Because Ronayne did not testify at trial, Ravitz's version of the story was the only one the jury heard. IfRonayne had testified that it was Ravitz who had persuaded him to sell cocaine, there may have been evidence sufficient to support a finding of entrapment and the district court would have been required to give the instruction. As it is, however, there was no evidence at all tending to suggest that Ronayne was entrapped. We conclude that this assignment of error is meritless.
 
 B.
 
 19
 Ronayne next assigns error to the district court's admission of Ronayne's statement, made at the time of his arrest, that there was a gun in his jacket pocket. He argues that because he was in custody at the time the agent asked him ifhe was armed, and the agents had not yet read him his Miranda rights, the admission of this statement violated his rights under the Fifth Amendment as announced in Miranda v. Arizona, 384 U.S. 436 (1966).
 
 
 20
 Ronayne did not move before trial to have this statement suppressed. While he did object at trial when the statement was offered, that objection was not on Fifth Amendment grounds. The government argues, and Ronayne concedes, that this issue was not preserved. Consequently, we review the district court's ruling for plain error.
 
 
 21
 The Fifth Amendment, as interpreted by the Supreme Court in Miranda, prohibits the admission of a defendant's voluntary statements in the government's case in chief if the statement was obtained as a result of interrogation or its equivalent while the defendant was in custody and had not been advised of his rights and knowingly waived those rights. Id. In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court announced a public safety exception to this general rule. This exception does not depend on the subjective motivation of the arresting officer. The Court held that an officer's question to a defendant as to where the defendant had hidden his gun was not subject to the rule of Miranda because the concern for public safety or the officers' safety outweighs the prophylactic protection that Miranda provides. Id. at 657-58.
 
 
 22
 After Ronayne was taken into custody, the arresting agent asked him whether he was armed. Ronayne responded that there was a gun in his jacket, which had come off in the struggle. The admission of this statement was not error because the agent's question falls within the public safety exception of Quarles.
 
 C.
 
 23
 Both Ronayne and LaBarrie assign error to the district court's handling of the dismissal of Juror 202, but each does so for different reasons. Ronayne argues that the prosecutor's criminal history check on the jurors amounted to prosecutorial misconduct necessitating a new trial. LaBarrie argues that the court abused its discretion when, having found that Juror 202's explanation of his failure to disclose his criminal history was reasonable, the court nevertheless removed him from the jury. We shall address Ronayne's assignment of error first.
 
 1.
 
 24
 Although counsel for Ronayne complained that conducting a criminal history check on the jurors was "appalling," Ronayne did not request a mistrial. Consequently, we need only determine whether the district court's failure to declare a mistrial, sua sponte, was plain error. Fed. R. Crim. P. 52(b). This court has recently addressed plain error in the context of prosecutorial misconduct and stated that: "The plain error standard authorizes the Courts of Appeals to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Blandford, 33 F.3d 685, 709 (6th Cir. 1994) (internal quotation and citation omitted).
 
 
 25
 The district court did not commit plain error. Once the court learned that Juror 202 had not disclosed his misdemeanor criminal history it took the following steps to minimize the damage to the defendants: First, the court spoke to Juror 202 out of the hearing of all the other jurors. After listening to the juror's explanation that he thought the court was inquiring only about felony convictions, the court stated that it was satisfied with the juror's explanation and then admonished him not to discuss the matter with the other jurors. While Ronayne complains that there is no certainty that Juror 202 did not relate to the other jurors the information that the prosecutor had been investigating their criminal histories, there is no indication that he did so and we find it unlikely that Juror 202 would have divulged to the other jurors that his prior criminal sexual conduct with a child had been the subject of the court's questions to him.
 
 
 26
 Second, after reflecting on the matter, the court concluded that Juror 202 had intentionally misled the court as to his criminal history during voir dire:
 
 
 27
 I think it's clear that during the voir dire, there were other jurors who disclosed non-felony charges. If[Juror 202] was paying attention, I believe he was, he would know, would have known that I was not only talking about felonies, but I was talking about any contact whatever with the criminal justice system either as a defendant, a witness, or a victim. And I must have said that a hundred times. So I don't see how the Government can get a fair trial with that juror.
 
 
 28
 The court then decided to remove the juror in a manner least likely to embarrass the juror or to suggest an advantage to either side: an ostensible "blind draw" selection that gave the appearance that Juror 202 had been chosen at random. Even so, it is not unlikely that the other jurors may have been suspicious about the "blind draw" when the one juror to whom the court had spoken individually was then "randomly" chosen for excusal. The court went further than simply allowing the prosecutor to effectively use its last peremptory challenge at the blind draw stage; the court also gave the defendants an additional peremptory challenge so that they might remove from the final pool a juror of their choice. Ronayne's argument on appeal is based on a litany of horribles to which this sort of government conduct could conceivably lead. Ronayne states:
 
 
 29
 [T]his flexing of official muscle is a clear message to the jury that they are being watched by Big Brother. Juror 202 learned that he has no secrets from the U.S. Attorney. Despite the court's instruction to Juror 202 [not to reveal the information to the other jurors], there is no guarantee that the other jurors will not receive the message.
 
 
 30
 Ronayne does not state how any of this could or did deprive him of a fair trial, which is the burden he must meet to show plain error; that is, a "particularly egregious error ... that seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings."
 
 2.
 
 31
 LaBarrie's complaint about the court's decision to remove Juror 202 differs from Ronayne's. LaBarrie claims the district court abused its discretion by excusing Juror 202 because there were inadequate grounds for doing so. LaBarrie argues that the district court should not have dismissed the juror after the court found that the juror's explanation had been reasonable. Of course, this argument ignores the court's subsequent finding. "'Adistrict court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard."' Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 479 (6th Cir. 1987) (citation omitted).
 
 
 32
 Federal Rule of Criminal Procedure 24(c) states, in part, that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties."
 
 
 33
 The district court observed first hand the jury voir dire and, as we have stated, determined that Juror 202 must have intentionally refused to divulge his past criminal history. After reading the entire record of the voir dire, we conclude that the court's factual determination that Juror 202 intentionally withheld his criminal history was not clearly erroneous. Several other venirepersons indicated that they had had some contact with criminal courts such as a drunk driving charge and a dismissed misdemeanor assault charge. The court concluded that had the prosecutor, who had used his last peremptory challenge, known of Juror 202's history, he would have removed the juror from the pool. The court also stated that Juror 202 might have been removed for cause. We conclude that the district court did not abuse its discretion by removing this juror, especially since the defense was allowed to remove another juror, thus effectively giving the defense counsel an extra peremptory challenge.
 
 D.
 
 34
 LaBarrie assigns error to the district court's admission of LaBarrie's statement to Agent Alcaro made while an agent was speaking to LaBarrie's mother at her front door. LaBarrie argues that the statements made by the agents to his mother when he was arrested were the functional equivalent of interrogation, thus the statement should have been suppressed under Miranda.
 
 
 35
 After the agents arrested LaBarrie, they did not ask him any questions. One agent, Schoenrock, was explaining to LaBarrie's mother that they were arresting her son because they believed he was involved with Jason Ronayne in a cocaine transaction. Agent Alcaro testified at the suppression hearing that while Agent Schoenrock was speaking to LaBarrie's mother, LaBarrie interrupted and said to his mother: "Iknow Jason Ronayne. I know what this is about." LaBarrie then stated to Alcaro: "I didn't even talk to you that much before he delivered it." It was this last statement that was admitted, and of which LaBarrie now complains. Agent Alcaro testified that this statement was made while Agent Schoenrock was talking to LaBarrie's mother and that the statement was not made in response to any question that he or Agent Schoenrock directed to LaBarrie.
 
 
 36
 When reviewing the denial of a motion to suppress evidence, this court must consider the evidence in the light most favorable to the government. United States v. Williams, 962 F.2d 1218, 1221 (6th Cir.), cert. denied, 113 S. Ct. 264 (1992). This court applies the clearly erroneous standard to findings of fact when reviewing the ruling of a district court on a motion to suppress, but reviews conclusions of law de novo. Id.
 
 
 37
 In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court declared that "interrogation" for Miranda purposes means either direct interrogation or police conduct that is the equivalent of interrogation. This second concept involves
 
 
 38
 any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.
 
 
 39
 Id. at 301. The holding of Innis makes clear that even "subtle compulsion" does not equate to the concept of interrogation. Id. at 303.
 
 
 40
 LaBarrie claims that his statement should have been suppressed because it was the product of custodial "Innis" interrogation. We think not. The agents' explanation to LaBarrie's mother as to why they were arresting her son was not compulsion at all, subtle or otherwise, and certainly was not comparable to the situation in Innis in which the officers discussed among themselves how tragic it would be if one of the little girls from the handicapped school found the shotgun that the defendant had hidden, a statement the Supreme Court held did not amount to interrogation.
 
 E.
 
 41
 LaBarrie argues that the prosecutor's failure to provide him with notice of a summary of all of his inculpatory statements that the government intended to use at trial sooner than four days before trial was a violation of Fed. R. Crim. P. 16(a) and also the Due Process Clause as applied in Brady v. Maryland, 373 U.S. 83 (1963). LaBarrie acknowledges that this delay was unintentional, but argues that it was prejudicial nonetheless.
 
 
 42
 Federal Rule of Criminal Procedure 16(a) provides, in part, that:
 
 
 43
 The government shall also disclose to the defendant the substance of any other relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known by the defendant to be a government agent if the government intends to use that statement at trial.
 
 
 44
 (Emphasis added.) This court reviews a district court's decision under Fed. R. Crim. P. 16 for an abuse of discretion. United States v. Phillip, 948 F.2d 241, 250 (6th Cir. 1991), cert. denied, 112 S. Ct. 1994 (1992).
 
 
 45
 Under Brady, whether a statement was "material" is a mixed question of law and fact that we review de novo. Id. The standard for findings a denial of a fair trial under Brady is extremely difficultto meet. This court recently summarized the law in the context of a defendant's claim that he was prejudiced by the prosecution's delay in providing him with witness statements:
 
 
 46
 There is no general constitutional right to discovery in a criminal case, and Brady did not create one. However, Brady imposes on the government an obligation to turn over material that is both favorable to the defendant and material to guilt or punishment. Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial. Reversal for a Brady violation is required only where there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. Thus, Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. Delay only violates Brady when the delay itself causes prejudice.
 
 
 47
 United States v. Bencs, 28 F.3d 555, 560-61 (6th Cir. 1994) (internal quotations and citations omitted). LaBarrie complains that the prosecution did not notify him until four days before trial that it would introduce the statements that LaBarrie made after his arrest. The only statement admitted was the statement to Agent Alcaro: "Ididn't even talk to you that much before he delivered it."
 
 
 48
 The government argues that there could be no error under Rule 16(a) because the statement made by LaBarrie was not made in response to interrogation. Because we have concluded that the agent's statements were not the functional equivalent of interrogation, we agree that Rule 16 is inapplicable here.
 
 
 49
 This court's language in Bencs makes clear that Brady is not applicable to this case. Brady is concerned almost exclusively with the prosecution's failure to turn over material rather than mere delay and, more importantly here, Brady is concerned with exculpatory evidence, which this court in Bencs referred to as "favorable to the defendant." The statement that LaBarrie complains of is inculpatory. LaBarrie cannot meet the prejudice requirement of Brady; that is, he cannot show that there is a reasonable likelihood that the outcome of the trial would have been different because the statement of which he complains implicates him in the crime for which he was convicted.
 
 F.
 
 50
 Finally, LaBarrie argues that there was insufficient evidence that LaBarrie knew of the conspiracy and willingly joined it. He argues that the evidence could be seen as indicating that LaBarrie was nothing more than a "tool" for Ronayne, and that Ronayne used him to facilitate the drug transaction.
 
 
 51
 When an appellate court reviews a conviction for sufficiency of the evidence, the proper analysis is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979).
 
 
 52
 To prove a defendant's participation in a conspiracy under 21 U.S.C. Sec. 846, the government must prove three elements: 1) a conspiracy existed; 2) the defendant knew of the conspiracy; and 3) the defendant willinglybecame a part of the conspiracy. United States v. Bourjaily, 781 F.2d 539 (6th Cir. 1986), aff'd, 483 U.S. 171 (1987).
 
 
 53
 After a careful review of the record, we conclude that there is ample evidence to support LaBarrie's conviction, and that this assignment of error is frivolous. LaBarrie's argument is nothing more than the assertion that it is possible that he was not the supplier of the cocaine. There was ample evidence to support LaBarrie's conspiracy conviction.
 
 IV.
 
 54
 Because we conclude that all the assignments of error raised by the defendants are without merit, their convictions are AFFIRMED.