**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Harold M. NEWCOMB, Defendant–
Appellant.**

**No. 92–1529.**

United States Court of Appeals,
Sixth Circuit.

Argued May 4, 1993.

Decided Oct. 7, 1993.

---

Jennifer J. Peregord (argued and briefed), Charles F. Holman, III, Office of the U.S. Atty., Detroit, MI, for plaintiff-appellee.

Jonathan Epstein (argued and briefed), Rafael C. Villarruel, Federal Public Defenders Office, Detroit, MI, for defendant-appellant.

Harold M. Newcomb, pro se.

Before: MILBURN, RYAN, and NORRIS, Circuit Judges.

RYAN, Circuit Judge.

Harold M. Newcomb appeals from the judgment of conviction entered against him following a jury trial on two firearms-related counts. He argues that the district court's jury instructions warrant reversal because they failed to adequately instruct the jury on his theory that he was justified in possessing a firearm and ammunition. We agree, and for the reasons discussed below, we reverse.

## I.

Harold Newcomb was indicted in May 1991 on one count of possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d), and one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). The firearm was a sawed-off Remington .12 gauge shotgun with a 13-inch barrel and an overall length of 24 inches, and the ammunition consisted of four .12 gauge shotgun shells.

At trial, the witnesses for the government and for the defendant had slightly different versions of events on the night in question. Detroit Police Department Officer Thomas Boyle testified that he was patrolling the neighborhood of Woodward and Lawrence

Streets the evening of May 5, 1991, when he saw two men and one woman standing in the entrance to an alley. As he drove toward them, the three began walking down the alley. The taller of the three was walking a couple of steps behind the other two. When Boyle drove into the alley, the three were approximately 30 yards in front of him. He saw the taller man put a dark object, approximately two feet long, into a couch that had been abandoned in the alley. Boyle identified Newcomb as that taller man. About ten seconds later, Boyle got out of his car and asked the three to stop. Boyle performed a pat-down of the defendant, and found four .12–gauge shotgun shells in his right coat pocket. Boyle returned to the couch, and observed the butt of a .12–gauge sawed-off shotgun sticking out about five inches from underneath a cushion in the couch. He then arrested Newcomb.

The defendant's theory of the case at trial argued a justification defense for his possession of the gun. According to the testimony of the defense witnesses,[1] Newcomb was watching television at the home of his girlfriend, Betty Benson, when she entered the room and told him that her son had just grabbed a gun and run outside, threatening to kill someone. Betty, her brother Darnell, and Newcomb left the apartment in search of Louis Benson, Betty's son. They were fearful that he would in fact harm someone, because he had shot people in the past.[2] Newcomb acknowledged that he had no fear of personal harm, because he felt protected by the presence of Louis's mother and brother; he felt, however, an obligation to prevent Louis's imminent violence toward an unknown third party.

According to Newcomb's evidence, he, Betty, and Darnell caught up with Louis in the alley. Louis, after an argument, handed his gun over to Newcomb. Newcomb unloaded the gun and put the shells in his pocket. Testimony differed over whether Louis then grabbed the gun from Newcomb or whether Newcomb then returned the gun to Louis. In either event; Louis next headed back down the alley, and discarded the now-useless gun by putting it in the couch. Heading back toward the apartment, apparently in search of another weapon, Louis declared, "Well, that's all right, I'm still going to get the motherf* * *er. I got something else." Newcomb tried unsuccessfully to catch Louis, and then rejoined Betty and Darnell in the alley. It was at this point, according to the defense, that the police arrived and arrested Newcomb.

The defendant requested that the jury receive a number of instructions, two of which are at issue in this case:

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 6

### Necessity

One of the issues in this case is whether the Defendant acted out of necessity. Necessity occurs when circumstances beyond one's control force him to commit a criminal act. The defense of necessity is available when a defendant is faced with a choice of two evils and finds himself in a position where he must violate the law because it is the lesser of two evils. A defendant who acts out of necessity must be found not guilty.

If the defendant committed the offense charged only because he reasonably feared that immediate, serious, bodily harm or death could be inflicted upon himself or another if he did not commit the offense, and he had no other reasonable opportunity to avoid that harm, then he acted out of necessity.

The government has the burden of proving that the defendant did not act out of necessity. Unless the government proves beyond a reasonable doubt that defendant did not act out of necessity, you must find him not guilty.

. . . .

---

1. The witnesses were Newcomb himself; his girlfriend, Betty Benson; and Frankie Higginbottom, a friend of Benson whose apartment window faces the alley.

2. Testimony at trial also indicated that Louis was a drug dealer.

DEFENDANT'S REQUESTED JURY
INSTRUCTION NO. 7

*Theory of Defense*

. . . .

The defense says Mr. Newcomb acted out of necessity. Mr. Newcomb argues that he acted in taking the firearm away from Louis Benson and removing the shotgun shells to avoid a greater harm or evil to society, that being an assault and possibly a murder. Mr. Newcomb acted at the behest of Louis Benson's mother, Betty Benson, who pleaded with Mr. Newcomb to stop her son from commiting [sic] a criminal act that would ruin his life. Mr. Newcomb believes that because of the situation that was unfolding before him he had to act quickly and choose between stopping this armed and angry young man and violating the law by temporarily possessing the firearm and ammunition and that he chose the lesser of two evils.

Following the close of the evidence, the district court refused to give an instruction like Defendant's Requested Jury Instruction No. 6, reasoning that "[i]t's per se illegal, per se contrary to the law for a person convicted of a felony to have in his possession a gun. There can be no innocent possession." The court consented, however, to instruct the jury generally on the defendant's theory of the case. The instructions, in relevant part, were as follows:

[T]he defendant in this case contends that he acted only because of the circumstances in which he found himself on that particular evening. He contends that he acted, in taking the firearm away from one Louis Benson and removing the shotgun shells, in order to avoid greater harm or evil; that being his belief and knowledge, that Louis Benson was about to commit an assault and a possible murder. He contends, in other words, . . . that he acted at the behest of Mrs. Newcomb [sic] when she asked that he stop her son from committing a criminal act that would ruin his life. Defendant contends that because of the situation that was developing and had developed, he had to act quickly and he acted without any intent to violate the law.

The court also instructed the jury "that the length of time that an individual possesses any particular firearm or ammunition is immaterial. The offense is made out if the possession is just for a very, very brief, brief time."

The jury convicted Newcomb on both counts. He was sentenced to 51 months' imprisonment and two years' supervised release on each count, to be served concurrently. Newcomb timely appeals.

**II.**

 This court reviews the jury charge as a whole to determine whether it fairly and adequately submits the issues and the law to the jury. *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir.1991). A refusal to give requested instructions is reversible error only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case. *Id.* Although a jury instruction "'should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation,'" *United States v. James*, 819 F.2d 674, 675 (6th Cir.1987) (citation omitted), so long as there is even weak supporting evidence, "[a] trial court commits reversible error in a criminal case when it fails to give an adequate presentation of a theory of defense." *United States v. Plummer*, 789 F.2d 435, 438 (6th Cir.1986).

**III.**

Newcomb contends that the court refused to adequately instruct the jury on his theory of the case—that is, that Newcomb was justified in breaking the law—and that this failure constitutes reversible error. The court's summary of Newcomb's theory was inadequate to instruct the jury, he argues, because it failed to articulate the law of justification and failed to offer the defense as a basis for acquittal.

**A.**

The government initially argues that the particular jury instruction submitted by the

defendant contains an erroneous statement of law, because it assigned to the government "the burden of proving ... that Newcomb did not act out of necessity." It reasons that it cannot, therefore, be reversible error for the district court to have elected not to give the instruction.

■ The government is correct only insofar as it points out the error of law; it was not the government's burden to prove beyond a reasonable doubt that the defense did not apply to this case. *See United States v. Wolak*, 923 F.2d 1193, 1198 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991). But the government misinterprets the dictate of *Williams* and other cases—in which the court stated that a district court's "refusal to deliver a requested instruction is reversible only if that instruction is ... a correct statement of the law," *Williams*, 952 F.2d at 1512—when it argues that the error in Jury Instruction No. 6 relieved the district court from giving any instruction whatsoever on justification. The district court was responsible for making the necessary alterations to the instruction, assuming *arguendo* that the theory on the whole was legally sound and that Newcomb presented sufficient evidence to justify the instruction. The legal error could not serve to simply eliminate Newcomb's otherwise-existing right to a justification instruction.[3] If Newcomb was entitled to an instruction on justification, the legal error in the precise charge he requested meant that the district court had no obligation to instruct using that exact language, but it does not mean that Newcomb entirely forfeited his right to have the court instruct the jury on the proper legal principles concerning the defense. *United States v. Paolello*, 951 F.2d 537, 543 (3d Cir.1991); *cf. Wolak*, 923 F.2d at 1198.

### B.

#### 1.

The parties use the terms "justification" and "necessity" as if they were interchangeable. They are not. "Justification," and its counterpart, "excuse," are terms for general categories of defenses. *See* Wayne R. La-Fave & Austin W. Scott, Jr., *Criminal Law* 356 (1972). "Justification" pertains to the category of action that is exactly the action that society thinks the actor should have taken, under the circumstances; "excuse," on the other hand, denotes a more grudging acceptance of an action, where society wishes the actor had not done what he did, but will not hold him blameworthy. Self-defense is an example of the former, while mistake of fact is an example of the latter. And "necessity" is also a particular example of a defense that, when proved, will *justify* the defendant's action, *id.* at 381–88, because "[t]he theory of necessity is that the defendant's free will was properly exercised to achieve the greater good and not that his free will was overcome by an outside force as with duress." *United States v. Contento–Pachon*, 723 F.2d 691, 695 (9th Cir.1984). The Supreme Court has discussed the common-law defense of necessity, and formulated a modern understanding of the term:

> [T]he defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils....

> [In modern cases,] ... the majority felt that the defense[ was] designed to spare a person from punishment ... if he reasonably believed that criminal action "was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense."

*United States v. Bailey*, 444 U.S. 394, 409–10, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980) (citation omitted).

As the Court in *Bailey* pointed out, the precise content of the necessity defense has altered substantially over recent years. We will use the broader term of justification in discussing Newcomb's proffered defense in an attempt to avoid confusion.

---

**3.** We note that the district court quite clearly did not rely on this legal error as the basis for refusing to give the instruction.

#### 2.

■ In *United States v. Singleton,* 902 F.2d 471 (6th Cir.), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990), this court "h[e]ld that a defense of justification may arise in rare situations" in the case of a defendant charged under 18 U.S.C. § 922(g) with being a felon in possession of a firearm. *Id.* at 472. Here, Newcomb was charged with violating both section 922(g)(1) and 26 U.S.C. § 5861(d). While conceding that *Singleton* definitively disposed of the issue with regard to section 922(g), at oral argument the government advanced the position that section 5861(d) is a strict liability statute, and that a justification defense should therefore not be available.

In *Bailey,* the Court, despite concluding that the defenses were inapplicable in the case before it, firmly stated that common-law defenses may be employed as defenses to a statutory crime. *Bailey,* 444 U.S. at 408–09, 100 S.Ct. at 633–34. The Court cautioned that "Congress in enacting criminal statutes legislates against a background of Anglo–Saxon common law." *Id.* at 415 n. 11, 100 S.Ct. at 637 n. 11. It therefore found this type of defense to be available "in spite of [a statute's] absolute language and lack of a *mens rea* requirement." *United States v. Panter,* 688 F.2d 268, 271 (5th Cir.1982) (citing *Bailey* ). As the *Panter* court explained,

> *Bailey* teaches that Congress's failure to provide specifically for a common-law defense in drafting a criminal statute does not necessarily preclude a defendant charged with violating that statute from relying on such a defense. This conclusion is unassailable; statutes rarely enumerate the defenses to the crimes they describe. The government's theory of absolute liability ascribes to [the statute] an effect "more comprehensive than was contemplated and one inconsistent with our philosophy of criminal law."

*Id.* (footnote omitted) (quoting *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952)).

We are entirely unpersuaded by the government's contention, and believe that its argument is foreclosed by the *Bailey* Court's rationale. We find no plausible basis not to extend the rationale of *Singleton* to cover 26 U.S.C. § 5861(d). This court has adopted a restrictive view of the availability of the justification defense in connection with section 922(g), in order to ensure that the statute's strict prohibition of possession of firearms by all convicted felons is effectuated. *See Singleton,* 902 F.2d at 472–73. While we believe this restrictive approach is sound, and equally important in the context of section 5861(d), we do not think it is appropriate to abrogate the availability of the defense altogether. We therefore conclude that a justification defense may be available to a defendant charged with violating either of these statutes.

#### 3.

In *Singleton,* this court named five factors that control in ascertaining whether a jury instruction presenting a justification defense is merited.[4] The evidence must show:

> (1) that defendant was under an unlawful and "present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury," ...;

> (2) that defendant had not "recklessly or negligently placed himself in a situation in which it was probable that he would be [forced to choose the criminal conduct]," ...;

> (3) that defendant had no "reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,'" ...; and

> (4) "that a direct causal relationship may be reasonably anticipated between the [criminal] action taken and the avoidance of the [threatened] harm."

*Singleton,* 902 F.2d at 472 (citations omitted; bracketed material in original). The fifth

---

4. The type of test set forth in *Singleton,* described in a nearly identical manner by the other circuits that have discussed the defense, is often referred to as a four-part test. *See, e.g., Paolello,* 951 F.2d at 540; *United States v. Harper,* 802 F.2d 115, 117 (5th Cir.1986). This circuit, however, has clearly identified five distinct factors.

requirement is that the defendant show that he did not maintain the illegal conduct any longer than absolutely necessary. *Id.* at 473. The *Singleton* court emphasized that "the keystone of the analysis is that the defendant must have no alternative—either before or during the event—to avoid violating the law." *Id.*

### C.

#### 1.

■ *Singleton* phrases the first requirement for the successful employment of the justification defense as being "that *defendant* was under an unlawful and 'present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury'[.]" *Singleton,* 902 F.2d at 472 (emphasis added). The language employed might seem to suggest the preclusion of the type of argument made by Newcomb: that he was acting to forestall harm *to an unknown third party,* rather than to himself. On closer examination of *Singleton* and its rationale, however, we conclude that this type of argument is a permissible basis for the justification defense.

Although *Singleton* phrases the first criterion in terms of harm to the defendant himself, it did not establish a rule that the justification defense applies only in those circumstances, and we do not understand *Singleton* to mean that in all cases, the defendant's fear may only properly be directed at his own well-being. Under the facts of *Singleton,* it is true, the defendant feared for his own welfare; the same was true in *United States v. Gant,* 691 F.2d 1159 (5th Cir.1982), which *Singleton* relied on in framing this

circuit's five-part test, and it was also the case in *United States v. Bailey,* 585 F.2d 1087 (D.C.Cir.1978) (Wilkey, J., dissenting), *rev'd,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 which *Gant* partially quoted in framing this particular prong of the test. But although the limited facts of those cases may have given rise to narrow language,[5] the holdings and rationales of the cases are not so narrow in application. Instead, as discussed more fully in section III.B.(1), *supra,* the rationale for allowing the defense is that there are times when "the public interest requires the selection of the lesser of two evils." *Bailey,* 585 F.2d at 1111; *see United States v. Burton,* 894 F.2d 188, 191 (6th Cir.). *cert. denied,* 498 U.S. 857, 111 S.Ct. 157, 112 L.Ed.2d 123 (1990). In light of the fact that the philosophical underpinning of the justification defense is the avoidance of a greater evil, it is fundamental that the defense must apply equally to a choice-of-evils case when the evil is to a third party as to the case where the evil is to one's self. Conduct should be deemed justified when it is an emergency measure necessary to avoid an imminent injury—an injury sufficiently grave that, according to objective standards, the desirability of avoiding that injury outweighs the desirability of avoiding the injury sought to be prevented by the violated statute. *Cf. United States v. Schoon,* 939 F.2d 826, 828–29 (9th Cir.1991).

The harm that Newcomb asserts he desired to avoid was the death or severe bodily injury of a third person. Applying an objective standard of what is right and proper conduct under these circumstances necessarily leads to the conclusion that it would be

---

5. We note, moreover, that the actual language of *Bailey* is in fact not limited in the way that the partial quotation employed by the *Singleton* and *Gant* courts would seem to suggest; instead, the *Bailey* language is broad, and would permit either fear to the defendant himself or fear on behalf of a third party to serve as a basis for the justification defense. The relevant part of Judge Wilkey's dissent in *Bailey,* from which *Singleton* and *Gant* quote, reads in full as follows:

> Traditionally, claims of duress, compulsion, and necessity are treated as defenses [of excuse or justification]. Under the classic "duress" defense, a defendant will be excused from committing an otherwise criminal act if he was *compelled* to perform the act by the unlawful

threats of another person. The defense has three elements. First, in order to excuse the commission of a criminal act, the coercion must be *present, imminent, and impending* and of such a nature as to induce a well-grounded apprehension of *death or serious bodily injury.* Second, there must be no opportunity to avoid the threatened harm. And finally, the defense may never be raised to justify the taking of innocent life.

*Bailey,* 585 F.2d at 1110–11 (footnotes omitted). It is readily apparent that this language cannot be employed in support of the proposition that the threatened harm may be directed only at the defendant himself.

better for Newcomb to have possessed the gun and the ammunition for a brief period than to have had Louis Benson kill or severely injure a third party. We note, moreover, that the threat, as described by Newcomb, otherwise meets the first requirement of *Singleton*. The threat (a) was unlawful, because Louis Benson was threatening to commit murder; (b) was present, imminent, and impending, because Louis had the gun in his hand and was running to confront his adversary; and (c) was of a nature as to induce a well-grounded apprehension of death or serious bodily injury, because Louis made his intention to do harm quite explicit, had in the past shot people, and was carrying a weapon.

Moreover, in canvassing other circuits' treatment of the defense, we find that most who have considered the question would permit application of the justification defense when avoidance of harm to third parties is the basis for the defendant's action. The Ninth Circuit, for example, frames its test as follows:

> As a matter of law, a defendant must establish the existence of four elements to be entitled to a necessity defense: *(1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm;* (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law.

*United States v. Aguilar*, 883 F.2d 662, 693 (9th Cir.1989) (emphasis added) (citing *United States v. Dorrell*, 758 F.2d 427, 430–31 (9th Cir.1985)), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). The Eleventh Circuit also accepts this type of defense. *Pollgreen v. Morris*, 770 F.2d 1536, 1545 (11th Cir.1985). The First Circuit has implicitly allowed use of the defense, without directly deciding the question, *United States v. Smith*, 982 F.2d 681, 682–83, 685 (1st Cir.1993), as has the Seventh Circuit, *United States v. Wheeler*, 800 F.2d 100, 107 (7th Cir.1986), *overruled on other grounds, United States v. Sblendorio*, 830 F.2d 1382, 1393 (7th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988).

We conclude that the justification defense should be understood to apply when a defendant is acting out of a desire to prevent harm to a third party, assuming that the other aspects of *Singleton*'s first requirement are met.

### 2.

The government does not raise a challenge to the second of *Singleton*'s requirements; that is, it does not suggest that Newcomb recklessly placed himself in the situation that led him to choose the criminal conduct. We nonetheless view the requirement as meriting some discussion because it seems a challenge that might be readily made in this case, given that the defendant chose to pursue the gun-wielding Louis Benson. This is not, however, the *type of case where a felon* "arm[ed] himself . . . and [went] looking for trouble." *Wheeler*, 800 F.2d at 107. Neither did Newcomb prolong or renew the conflict. *See United States v. Isom*, 992 F.2d 91, 93 (6th Cir.1993); *United States v. Nolan*, 700 F.2d 479, 484–85 (9th Cir.), *cert. denied*, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983). Instead, Newcomb was behaving in a perfectly reasonable and legal manner when the emergency situation presented itself to him. There was no reason for him to think that, in watching television at his girlfriend's house, he was inviting a confrontation with her armed son. As the *Paolello* court recognized, "[t]his case differs qualitatively from one in which, for example, a defendant enters a premises to commit a crime and then is confronted with an armed occupant." *Paolello*, 951 F.2d at 541.

It simply cannot be said that Newcomb was behaving recklessly or negligently by being at Betty Benson's house. And in pursuing Louis he was merely reacting to what we have already determined to be "an unlawful and 'present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury[.]'" *Singleton*, 902 F.2d at 472. Thus, even though Newcomb admittedly left the house of his own volition to try to stop Louis Benson, a reasonable juror could conclude that he did not act recklessly or negligently in doing so.

**3.**

The government contends that Newcomb did not demonstrate that he fulfilled the third of *Singleton*'s requirements: that he had no " 'reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm[.]" ' " *Singleton,* 902 F.2d at 472. It argues that Newcomb could have called the police, or had Betty or Darnell Benson disarm Louis.

However, a reasonable jury could find those suggested alternatives implausible and unreasonable, if it concluded that Newcomb was faced with an emergency situation. The cases in which this requirement has been deemed not to be met have all been cases in which the defendant's illegal conduct spanned over a long period. For example, in *United States v. Liu,* 960 F.2d 449 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992), the defendant was charged with various crimes in connection with the attempted purchase of illegal "green cards." He claimed that his actions were due to fear of certain government agents. But as the court pointed out, Liu met the government agent whom he feared in January 1988, and was not arrested until January 1990. During that stretch,

> Liu had a number of reasonable alternatives to the continued illegality. He could have surrendered to federal officials in any city in the United States. He could have communicated with federal officials in any city in the United States. He could have remained abroad. He could have sought protection in another city.... For obvious reasons, the record is a fertile field to find many reasonable legal alternatives to violating the law over a two year period.

*Id.* at 454–55.

The Second Circuit considered a similar scenario in *United States v. Bakhtiari,* 913 F.2d 1053 (2d Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991), where the defendant was convicted on various firearms charges. He argued that certain unidentified Iranians threatened him and his family unless he assisted them in obtaining certain chemicals. His illegal conduct was almost a year in duration, and the district court therefore had

> properly concluded that [the] evidence was insufficient to establish that Bakhtiari took reasonable steps to escape the threatened harm or to alert the proper authorities to his predicament. It is undisputed that Bakhtiari never communicated the alleged threats to any federal, state or local law enforcement authority.... We have no hesitancy in concluding that, under the facts of this case, the ... evidence ... falls far short of the necessary threshold showing o[f] reasonable steps to alert the authorities that would require a district court to permit the defense to go to a jury.

*Id.* at 1058.

Yet another example is found in *United States v. Scott,* 901 F.2d 871 (10th Cir.1990), where the defendant was involved in illegal activity for more than 125 days. He

> had countless opportunities to contact law enforcement authorities or escape the perceived threats ... during this time.... Scott's failure to avail himself of the readily accessible alternative of contacting law enforcement officials is persuasive evidence of the hollow nature of Scott's claimed coercion defense.

*Id.* at 874.

When criminal conduct endures for 125 days, or a year, or two years, it is logical to conclude that a defendant who is not being held hostage must have ample opportunity to alert the authorities to his predicament. The same is not true in this case, where there was evidence that the emergency situation unfolded rapidly, almost spontaneously, and that Newcomb's criminal conduct lasted for mere minutes. According to the defendant's evidence, Louis Benson was running with a gun to an unknown location, in order to shoot someone. Under such circumstances, a jury could conclude that if Newcomb had stopped to call the police, he would have lost track of Benson, and the call would have been futile. Furthermore, it would be reasonable to conclude that there was a crisis situation that simply did not allow Newcomb the luxury of choosing from among several alternative courses of action, some of which would not have required him to perform an illegal act.

*Cf. United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980), *cert. denied,* 450 U.S. 924, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981). Accordingly, Newcomb presented sufficient evidence to allow a jury to find that he had no time to attempt a legal alternative to possessing the firearm and ammunition. *See United States v. Lemon,* 824 F.2d 763, 765 (9th Cir.1987).

**4.**

The government's final argument is that Newcomb possessed the ammunition [6] for too long to entitle him to the justification defense.[7] As in the preceding section, however, the cases in which this requirement has been deemed not to have been met also differ greatly from the case *sub judice.* In *Smith,* 982 F.2d at 681, the defendant refused to surrender his gun at the request of a police officer from whom, according to his own testimony, he did not fear bodily harm. *Id.* at 685. The court concluded that although the defendant may initially have been justified in possessing the firearm, the defense was "rendered ... unsupportable under any view of the evidence," *id.,* because he maintained possession for too long.

In contrast, witnesses for the defense testified that Newcomb possessed the ammunition for what at most amounted to a few minutes before the arrival of the police, and only moments after the departure of Louis Benson. Furthermore, the emergency situation had only ended moments before, with the departure of Louis. This scenario is much more akin to that facing the *Paolello* court than it is to that present in *Smith.* In *Paolello,* a police officer

> testified that he chased Paolello down the alley, ordering him to stop running and identifying himself as a policeman, and that Paolello disobeyed the orders. If ... believed, this [testimony] would severely

undercut Paolello's justification defense because it would appear that Paolello had an opportunity to dispose of the gun and stop running earlier than he did, so that he possessed the firearm longer than absolutely necessary.

*Id.* at 542. But the court then turned its attention to Paolello's rendition of the events, which were that

> he ran down the alley because he was afraid that the man who had punched [his stepson] and had argued with Paolello would instruct his "friends" to chase Paolello. He also testified that as he "was running into the alleyway, I didn't know anybody was behind me.... I heard somebody say 'Stop,' you know? And I turned around, and I dropped the gun.... He said 'I'm an officer' and I just stopped."

*Id.* at 542–43. Under this version of the facts, the court concluded, "it appears that Paolello did not maintain possession of the weapon any longer than absolutely necessary." *Id.* at 543.

Newcomb presented sufficient evidence to allow a jury to conclude that he possessed the ammunition only for the duration of the emergency situation. The fifth requirement under *Singleton* therefore presents no bar to his entitlement to a jury instruction on justification.

**D.**

We have concluded that the justification theory was sound as a matter of law, and that the evidence could have supported a not guilty verdict on this theory. We therefore must examine the district court's instructions as a whole to assess whether they adequately presented the justification theory to the jury. *See Williams,* 952 F.2d at 1512.

---

6. The government apparently concedes that because, under the defendant's version of the facts, Newcomb returned the gun to Louis Benson almost immediately after unloading it, he cannot be said to have maintained possession of the gun for any longer than was absolutely necessary.

7. The government does not suggest that Newcomb failed to present evidence on *Singleton*'s fourth requirement " 'that a direct causal rela-

tionship may be reasonably anticipated between the [criminal] action taken and the avoidance of the [threatened] harm.' " *Singleton,* 902 F.2d at 472. We think it is plainly apparent that any such suggestion could not succeed, since disarming the gunman (the illegal action) could reasonably be expected to avoid having the gunman shoot someone (the threatened harm).

■ The government is unpersuasive when it argues that the instructions, taken together, were adequate to substantially cover Newcomb's proffered justification defense. The court did not present justification as a grounds for acquittal, and did not indicate that the defense of justification has a basis in the law. Furthermore, the court's instruction that possession is nonetheless possession regardless of the length of time directly undercut Newcomb's defense. Therefore, the fact that the court summarized Newcomb's theory of the case did not compensate for its failure to give Newcomb's requested instruction on justification. The failure to give the type of instruction requested by the defendant, albeit one that accurately stated the law of justification, significantly impaired Newcomb's case.

### IV.

Finally, Newcomb has also argued that, under 26 U.S.C. § 5861(d), a defendant must be aware of the characteristics of the weapon that make it subject to registration, and that because he only possessed the weapon for a moment, its length—the characteristic that makes it subject to regulation—was not immediately apparent to him. He cites *United States v. Williams*, 872 F.2d 773 (6th Cir. 1989), in support of this proposition. There, the court held that when a defendant was charged with possessing a firearm that had been rendered automatic "by internal modifications which did not change the external appearance of the gun," *id.* at 774, then "the government was required to show that defendants knew that a 'firearm' as legislatively defined was being transferred." *Id.* at 777.

Newcomb failed to object to the standard jury instruction regarding this issue, and we therefore review for plain error only. *United States v. Sturman*, 951 F.2d 1466, 1488 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992). We read *Williams*, 872 F.2d at 773, to apply only to cases where the dangerousness of the instrumentality is hidden. Thus, this assignment of error does not give rise to "a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Piccolo*, 723 F.2d 1234, 1241 (6th Cir.1983), *cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 817 (1984). We therefore reject this challenge.

### V.

In conclusion, we have determined that in this case the jury should have been instructed on the justification defense. As it was not, we **REVERSE** the judgment of conviction and sentence and **REMAND** the matter for a new trial.