NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0862n.06
Filed: October 19, 2005

No. 03-2311

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Western |
| IVEL RAY HOPKINS, | ) | District of Michigan |
| | ) | |
| Defendant-Appellant. | ) | |

Before: **BOGGS, Chief Judge; and NORRIS and COOK, Circuit Judges.**

**PER CURIAM.** Defendant-Appellant Ivel Ray Hopkins was convicted on four counts of mailing threatening communications, in violation of 18 U.S.C. § 876. Although Hopkins asked the court to instruct the jury on the affirmative defense of duress, the trial judge refused to do so. At sentencing, the trial judge imposed sentencing enhancements under the United States Sentencing Guidelines ("Guidelines") that effectively tripled Hopkins's sentencing range, increasing his sentence from 41-51 months to 121-151 months. The judge sentenced Hopkins to 124 months in prison, at the lower end of the range, followed by 3 years of supervised release. Hopkins contends on appeal that (1) the district court's refusal to instruct the jury on the duress defense constituted reversible error because Hopkins had introduced "ample evidence" to support the instruction; and (2) the use of the Guidelines to enhance Hopkins's sentence was unconstitutional because some of

-1-

No. 03-2311

United States v. Hopkins

the enhancements stemmed from disputed facts that had not been determined by a jury. We affirm

the jury instruction decision but remand for resentencing.

**I**

In conjunction with fellow inmates at Ionia Maximum Correctional Facility in Ionia, Michigan, Ivel Ray Hopkins launched a letter-writing campaign in the late spring and summer of 2001 in which he threatened the lives of the nation's leaders. In Hopkins's first letter, dated April 25 but received by the Washington, D.C. headquarters of the United States Secret Service on May 2, he demanded that $5 million be sent to the Isle of Man and "our unconditional pardons (freedom) before May 7th." If these demands were not met, he threatened "1) George W. Bush or one of his family members will be shot and possibly killed; 2) A cabinet member will have an accident that could possibly result in death; 3) Both of the twins are already marked for abduction; 4) George and Barbara will know unbearable grief as they watch their children die one after the other." Furthermore, the letter threatened "if 'T.J.' is to die on May 16th, be sure that George W. will be pushing up daisies, not witnessing it." As noted at trial, Timothy James McVeigh's original execution date had been May 16, 2001. Later in the letter, undersigned as well by Ionia inmates Joseph Sconyers and Steven Averitt, Hopkins wrote "Three started a revolution, three defeated Hitler, and the three of us will be the cause of the death of George W., Colin Powel [sic], John Ashcroft, and Hillary Clinton and there will be no warning." Upon the letter's second page, in which substantially the same words were repeated in a different hand, the phrase "3 4 life" was inscribed in blood.

No. 03-2311

United States v. Hopkins

Helpfully, Hopkins and the others had signed their names and attached their prisoner numbers and prison addresses to the letter. This prompted a visit to the prison by a Secret Service agent who, along with Ionia's inspector, warned Hopkins to discontinue writing such letters. Both at this time and at a later date, Hopkins admitted to the government agents that he wrote the first letter.

But Hopkins's letter writing did not stop. On May 18, the United States Marshals Service in Washington, D.C. received a letter from Ionia Prison bearing the return address of inmate Shawn Boyer. The Marshals Service transferred the letter to the Secret Service, to whom it was also addressed. This undated letter, in Hopkins's handwriting and signed by Hopkins and Sconyers despite the envelope's return address, stated, *inter alia*, "Don't send another fucking Secret Service asshole up here as the talking is over. Get the fucking money to the Isle of Man, be a good laddy or have a dead President." Unlike its predecessor, this letter directed the money to be sent to a specific bank. The letter specified May 19 as the new deadline for performance. The Secret Service interviewed Boyer and found that he had no knowledge of this letter.

On June 15, the Michigan Department of Corrections intercepted another letter containing Hopkins's return address. Dated June 4 and addressed to the Secret Service, the letter contained the same header phrase as Hopkins's first letter and was signed by Hopkins alone. He first noted that Sconyers

> had all of his legal materials and paper products taken from him as a result of my letter to the U.S. Marshalls [sic] in D.C. If you don't correct this shit and give him back his property 'NOW' someone else will have to pay for this because your actions against us will not be tollerated [sic] and the price may be your lives.

-3-

After again demanding money to be sent to the Isle of Man and unconditional pardons for himself and Sconyers, Hopkins repeated his threats to "Bush, his wife, the twins, a member of his cabinet, or someone else connected to him."

More than a month later, the Secret Service received a fourth letter from Hopkins, dated July 19. Signed by Hopkins and Sconyers, but penned in Hopkins's script, the letter recited various restrictions and punishments the authors had suffered since their letter-writing campaign began, most notably the fact that "people refuse to pass our legal correspondences" between Sconyers and Hopkins "and have taken me out of unit #1 placing me in unit #2 seperating [sic] us so that I can't assist Mr. Sconyers in legal research and litigation . . . ."[1] Following these and other complaints, Hopkins repeated his demands for money and freedom and his familiar threats to assassinate the president, members of his family, and other federal officials. This was the last threatening letter that Hopkins drafted.

More than a year passed before the government began to prosecute Hopkins in earnest. In the summer of 2002, Hopkins was notified that he would be asked to provide handwriting exemplars to the grand jury on August 13, 2002. On August 8, a prison guard at Ionia found a handwritten letter in Hopkins's script. In this letter, dated July 29 and addressed to Sconyers but never sent,

---

[1]Hopkins and Sconyers were each kept in the prison's high-security buildings. Prisoners in those units spend 23 hours in individual cells, eating and sleeping in the cell. For the one hour that the prisoners are allowed out of their cells to exercise, they are led, individually, by two guards to a small stainless steel "yard module" where they remain alone for the duration of their exercise period. The prisoners thus do not directly interact with one another. The last prisoner-on-prisoner assault at Ionia occurred more than three years before Hopkins's trial.

United States v. Hopkins

Hopkins noted that the government's agents had told him they had no intention of "going after" Sconyers, and that because of "all the changes in the law with all the terrorist attacks" Hopkins was asking Sconyers to write an affidavit that Sconyers "coer[c]ed Ivel Ray Hopkins (by dictation) to write letters in his own handwriting or I [Sconyers] would kill his family." Hopkins surmised that "this protects me on the handwriting exemplars and makes them prosecute both of us if they want me (then if you say I'll do it). Note: I'm not going without you and that's final." Separately, and possibly independently, Sconyers drafted an affidavit, dated July 24, in which he claimed "that I alone chose which target would be picked for extortion and terroristic threats," "that I wrote the letters that were to be sent," and "that I personally coerced Ivel Ray Hopkins to sign a blank sheet of paper, which I later wrote threats on."

Before the grand jury on August 13, 2002, Hopkins refused to provide a writing exemplar and, as a result, he was found to be in civil contempt by Judge Bell on September 20. As a result of Hopkins's consistent refusals to comply with the subpoena, the government obtained a total of twenty-eight samples of Hopkins's handwriting from his prisoner file. Based on these samples, Todd Welch, a handwriting expert with the Michigan police, confirmed that Hopkins had written all of the letters.

Strange though it was, Hopkins's was not Ionia's only campaign of making serious threats to national officials. As the prosecution noted during the sentencing hearing, other prisoners associated with Sconyers have sent similar letters, and some have even mailed packages containing white powder to government officials. Because Hopkins depended on obtaining a duress instruction,

a more detailed examination of the deeds and claims of inmate Joseph Sconyers is required to complete the story of Hopkins's writing campaign.

During its investigation, the government had come to understand that Sconyers sought to orchestrate these campaigns in order to be prosecuted federally and thereby be removed from the Michigan state system into federal facilities. At Hopkins's trial on May 6, 2003, Sconyers testified on behalf of the defendant. In his testimony, Sconyers claimed to be a former member of the Black Muslims but, because he had testified for the government against that group in 1993, a contract had been placed on his life. This forced the government to segregate him from the general prison population for his safety. For a short time following his 1993 testimony, Sconyers was placed in a federal facility for his safety and, since he decided that his treatment had been better in that facility than in the state system, he wanted to return to federal prison. According to his testimony, Sconyers first learned about the crime of extorting federal officials from one of his cellmates in the federal facility and he thereafter concocted a plan for obtaining a transfer to the federal system by extorting federal officials himself. Sconyers testified that he had begun his campaign of extortionate writing even before he was transferred to Ionia, but his plans were interrupted when Ionia's officials restricted his ability to obtain pen and paper.

Sconyers, who could not hope for a release from prison earlier than the year 2022, testified that he first befriended Hopkins and then threatened Hopkins's life and the life of Hopkins's mother unless Hopkins drafted extortionate letters on Sconyers's behalf. Sconyers claimed that his threats were made more realistic by his continuing membership in a criminal organization called the

Gangsta Disciples, providing, he claimed, the ability to order the assassination of people outside the prison system. Sconyers testified that the letters were written at his behest, that he had personally approved the language, and that Hopkins only wrote them under duress. Sconyers was the only witness to testify on Hopkins's behalf, and his testimony constitutes the only evidence of duress that Hopkins introduced.

According to Sconyers, the letter writing campaign ended when both he and Hopkins were placed on paper restriction, after which it "was very, very hard to get anything done." In September 2001, Sconyers left the unit that he had shared with Hopkins. As a result, he

> had no way to make sure that Mr. Hopkins would do exactly what he said to do because if [he] is off the block, [he] can threaten him, but [he] would have to send [letters] from one unit to another unit, and that would be no good because staff would open that up and find them threats.

After that date, Hopkins "was basically no more use" to Sconyers.

On May 6, 2003, Hopkins was tried on four counts of mailing threatening communications, in violation of 18 U.S.C. § 876. Although the defendant requested a jury instruction on a defense of duress, the district court decided not to issue the instruction "for a variety of reasons. For one thing, the defendant has not testified, and I think the defendant's testimony is critical to this instruction." The jury convicted Hopkins on all four counts. At the sentencing hearing, the government noted that it had decided to prosecute him in order to deter the other prisoners at Ionia from continuing their own letter-writing campaigns. During the trial, the government had admitted that it did not want to try Sconyers for this crime "because that would just be giving [him] what [he] claim[s he] want[s]." Hopkins's initial sentence range under the Federal Sentencing Guidelines was

No. 03-2311

United States v. Hopkins

41-51 months, but due to sentence enhancements, the final sentencing range was calculated to be 121-151 months. Prior to the sentencing hearing, defense counsel challenged the finding that Hopkins had demanded $5 million, on the grounds that the demand represented an empty threat, not an actual loss. The court ruled, however, that the demand for $5 million was a "face demand for money." The judge sentenced Hopkins to 124 months, to be followed by 3 years of supervised release.

## II

This court "reviews jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Brown*, 367 F.3d 549, 555 (6th Cir. 2004) (citing *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)). A district court judge's refusal to give requested jury instructions is reversible error only if "(1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993). Whether a defendant has established a defense of duress is a question of law and, on review, this court considers it *de novo*. *United States v. Johnson*, No. 04-5611, 2005 U.S. App. LEXIS 16152 at *8 (6th Cir. Aug. 5, 2005) (citing *United States v. Jankowski*, 194 F.3d 878, 882 (8th Cir. 1999) and *United States v. Moreno*, 102 F.3d 994, 997 (9th Cir. 1996)).

A defendant requesting an instruction "has a preliminary burden to introduce some evidence to trigger consideration of the defense, although that burden is not a heavy one." *United States v.*

-8-

*Riffe,* 28 F.3d 565, 569 (6th Cir. 1994). "Although a jury instruction should not be given if it lacks

evidentiary support or is based upon mere suspicion or speculation, so long as there is even weak

supporting evidence, [a] trial court commits reversible error in a criminal case when it fails to give

an adequate presentation of a theory of defense." *Newcomb*, 6 F.3d at 1132 (internal quotations and

citations omitted). A court "is certainly not required to instruct the jury on a defense the theory of

which is not even supported by the testimony of the defendant adduced at trial." *United States v.*

*Plummer*, 789 F.2d 435, 438 (6th Cir. 1986) (quoting *United States v. Williams*, 604 F.2d 277 (4th

Cir.), *cert. denied*, 444 U.S. 967 (1979)).[2] "Therefore, where the evidence is insufficient as a matter

of law to support a duress defense, a trial judge should exclude that evidence." *United States v.*

*Johnson*, 2005 U.S. App. LEXIS 16152 at *8.

Under this circuit's law, a defendant in a prosecution for possession of a firearm as a felon

may assert the defense of necessity or justification. In *United States v. Singleton*, 902 F.2d 471 (6th

Cir.), *cert. denied,* 498 U.S. 872 (1990), this court found persuasive the reasoning of *United States*

*v. Gant*, 691 F.2d 1159 (5th Cir. 1982), and *United States v. Stover*, 822 F.2d 48 (8th Cir. 1987),

which established a five-factor test for the defendant to prove a defense of necessity. However, the

defense is appropriate only in "rare situations[,] . . . should be construed very narrowly," and a

---

[2]In *Williams*, the defendant's own trial testimony did not support the duress defense and may have even contradicted it. *United States v. Williams*, 604 F.2d at 281. "When a theory of defense finds some support in the evidence and in the law, a defendant is entitled to some mention of that in the instructions. Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense." *United States v. Garner*, 529 F.2d 962, 969-70 (6th Cir. 1976).

No. 03-2311

United States v. Hopkins

district court will not err "in refusing to instruct the jury on this defense if the evidence could not support a verdict based on it." *Singleton*, 902 F.2d at 472-73 (citing *United States v. Bailey*, 444 U.S. 394, 398-99 (1980)). Under the rule of *Singleton*, instructions on the defense of necessity are proper if the defendant has produced evidence upon which a reasonable jury could conclude by a preponderance of the evidence that each of the following five circumstances exist:

(1) defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;

(2) defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;

(3) defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm;

(4) a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm; and

(5) defendant did not maintain the illegal conduct any longer than *absolutely* necessary.

*Singleton*, 902 F.2d at 472-73 (emphasis added); *Newcomb*, 6 F.3d at 1134-35; *United States v. Hargrove*, 416 F.3d 486, 490 (6th Cir. 2005). "[T]he keystone of the analysis is that the defendant must have *no alternative* – either before or during the event – to avoid violating the law." *United States v. Lacy*, No. 90-6161, 1991 U.S. App. LEXIS 28776 at *9 (6th Cir. Dec. 2, 1991) (emphasis in original).

Although *Singleton* involved a case of a felon's firearm possession, this circuit has since recognized the test's potential applicability in cases in which the defendant stands accused of robbery (*United States v. White*, No. 03-5735, 2005 U.S. App. LEXIS 10300 (6th Cir. May 31,

2005)), conspiracy to distribute marijuana and aiding and abetting the use of the mail to facilitate the distribution of marijuana in prison (*Riffe*, 28 F.3d 565), and mail or wire fraud (*United States v. Milligan*, 17 F.3d 177 (6th Cir. 1994)).  This comports with the logic of *United States v. Bailey*, in which the Supreme Court stated that "Congress in enacting criminal statutes legislates against a background of Anglo-Saxon common law." *Bailey*, 444 U.S. at 415, n. 11.  For this reason, common law defenses may be employed as defenses to a statutory crime.  *Id.* at 408-09.  By extension, this court employs the *Singleton* test to assess whether the district court should have issued a jury instruction on duress in a case of mailing threatening communications.

As noted previously, the district judge denied the defendant's proposed instruction on the issue of duress "for a variety of reasons.  For one thing, the defendant has not testified, and I think the defendant's testimony is critical to this instruction."  Although it is obviously not required as a matter of law that the defendant testify in order to satisfy *Singleton*, it is undeniable that the defendant's personal testimony might provide evidentiary support for meeting his preliminary burden under *Singleton*, and without such testimony it is equally undeniable that the actual evidence proffered might be insufficient as a matter of law.  We therefore must assess all of the evidence to determine whether the evidence actually submitted meets *Singleton*'s threshold.

*Singleton*'s first factor concerns whether the defendant was under an "unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury."  *Singleton*, 902 F.2d at 472.  This court has previously upheld a defendant's right to an instruction on duress when the witness himself and several other witnesses

-11-

testified to the threats he had received from a prison gang, substantiated by the fact that the witness had been stabbed in the chest while in the prison's protective custody. *Riffe*, 28 F.3d at 568. Similarly, in *Singleton* this court viewed as sufficient the defendant's testimony that he had obtained the firearm while escaping from a kidnapper who had threatened to kill him. *Singleton*, 902 F.2d at 472-73. In *Newcomb*, the defendant's necessity defense (for possession of an unregistered firearm) was substantiated by three witnesses, including the defendant himself, who stated that the defendant had been told by his girlfriend that her son had just walked out of the house, gun in hand, after threatening to kill someone. *Newcomb*, 6 F.3d at 1136. Yet this court has also rejected the defendant's duress instruction when the threat in question came from an unknown and unarmed man who suggested "he wasn't supposed to be" in a particular neighborhood and asked "[d]o you want a drive-by or your family to go down or something?" *Hargrove*, 416 F.3d at 490. If the threat is merely speculative or conjectural, or if the evidence is simply too thin to substantiate the claim, then the district court could properly reject a duress defense based on *Singleton*'s first factor.

Sconyers's testimony constituted the only evidence that Hopkins adduced at trial. According to Sconyers's testimony, Hopkins only wrote the letters after Sconyers threatened to have him and his mother assassinated, and the credibility of this threat rests largely on the witness's assertion of membership in the Gangsta Disciples. As Hopkins himself did not testify at trial and no written threats were introduced, there was no evidence to substantiate Sconyers's claims. Indeed, no evidence was introduced to suggest that Hopkins was at all fearful.

No. 03-2311

United States v. Hopkins

Moreover, Sconyers admitted in his direct testimony that he possessed a motive and scheme for incriminating himself in federal court and that his ability to communicate with and threaten Hopkins was gravely hampered after the prison separated the two inmates. He also strongly suggested that his threats to Hopkins and Hopkins's mother were not legitimate. Yet Hopkins wrote his fourth letter after the two had been separated, at a time when Sconyers himself admitted that any ability to threaten Hopkins had withered. Furthermore, the defendant introduced no evidence to substantiate Sconyers's claims regarding his membership in and influence with the Gangsta Disciples, nor did the defendant introduce any evidence of a legitimate threat to Hopkins's mother beyond Sconyers's mere possession of the unfortunate woman's name and home address. To compound any doubts as to Sconyers's credibility in this matter, the government introduced handwritten letters in which Sconyers expressed friendship, intimacy, and close familiarity with Hopkins, both before and after the letter-writing campaign. The district court noted that the defendant could have established the elements of the *Singleton* test had he himself testified, but in the absence of his testimony or other evidence, the court was left to rely solely on Sconyers's testimony and to infer from it that Hopkins possessed a well-founded fear. Because Hopkins's assertion of a duress defense rests solely on Sconyers's self-interested and unsubstantiated testimony, a reasonable person could not find, as a matter of law, that Hopkins had demonstrated that he was under a threat and possessed a well-grounded fear of that threat by a preponderance of the evidence.

No. 03-2311

United States v. Hopkins

Singleton's third factor inquires as to the availability to the defendant of a reasonable, legal alternative to violating the law. Singleton, 902 F.2d at 472-73. In Riffe, the court accepted as sufficient the testimony of several witnesses that the defendant could not reasonably escape the danger posed by the prison gang, and this was reinforced by the fact that the defendant had been stabbed in the chest while in the prison's protective custody. Riffe, 28 F.3d at 568. In our case, the defendant's evidence rests solely on the testimony of Sconyers, the progenitor of the supposed threats, who was a present and former member of several criminal organizations that could, he claims, assassinate selected targets beyond the prison's walls. Since Sconyers's testimony was entirely unsubstantiated, there was no evidence to suggest that Hopkins did take, or should have reasonably taken, Sconyers's supposed threats seriously.

Setting aside this witness's admitted motive to be prosecuted for a federal crime and the natural skepticism that this arouses in a neutral observer, the fact that this witness also admitted that his ability to communicate with and threaten Hopkins diminished radically after the prison had separated the two inmates strongly suggests that his supposed threats may have been bombast and bluff rather than substantial in nature. This suggests that Hopkins could have approached the prison's officials regarding Sconyers's threats. Contrary to the appellant's assertion, it was not incumbent on the prosecutor to introduce evidence that the prison system could protect Hopkins or his mother unless and until Hopkins had introduced sufficient evidence to substantiate his claim to a reasonable fear of reprisal. The fact that Hopkins drafted his fourth threatening letter after

-14-

Sconyers's contact with him had ended also suggests the unreasonableness of the defendant's unwillingness to find a legal alternative.

Finally, *Singleton*'s fifth factor inquires whether the defendant maintained the illegal conduct no longer than was absolutely necessary. *Singleton*, 902 F.2d at 473. In *Singleton* itself, the court accepted as sufficient the defendant's evidence as to his kidnaping and escape, but because the defendant remained illegally in possession of the firearm after his escape instead of getting rid of it and contacting the police or returning to his halfway house, the court ruled that he was not entitled to his justification defense. *Ibid.* Here, although the appellant does not specifically address this factor, it can be surmised from the appellant's argument that the requirements of *Singleton*'s fifth factor were satisfied by the fact that Hopkins ceased writing the letters after Sconyers was transferred to another unit. However, Hopkins wrote his fourth letter after he had been removed to another unit and thereby separated from Sconyers, demonstrating that he had been able to discontinue his illegal activity safely prior to writing that letter.

Hopkins failed to introduce any evidence concerning his supposed duress with the sole exception of the unsubstantiated and uncorroborated testimony of the author of his supposed duress. The fact that this witness admitted to a desire to be prosecuted federally and that he claims to have orchestrated the letter writing campaign in order to obtain a transfer from the Michigan prison to a federal facility creates a critical problem of credibility. Defendants enjoy a right to have the jury instructed regarding their preferred defenses, but an affirmative defense such as duress requires some minimal threshold of evidence to be established. Because he introduced so little evidence, and

because so much of that evidence is marked with inconsistencies and fundamental problems of credibility, the defendant in this case failed to present evidence upon which a reasonable juror could conclude that during the course of three months in 2001, while he wrote four letters threatening the lives of the nation's leaders, he possessed a well-founded fear of a threat of imminent serious bodily harm or death that he could not avoid or safely quit at an earlier stage. Accordingly, the district court properly denied Hopkins's request for a duress instruction.

### III

Hopkins contests a sentencing enhancement applied by the judge using factual findings not made by the jury. Hopkins does not contest two of the sentencing enhancements assigned by the trial judge. However, the judge assigned Hopkins a six-level financial enhancement under U.S.S.G. § 2B3.1(b)(7)(G), finding that the defendant had made a demand for between $2.5 million and $5 million in his threatening communications. The effect of this last enhancement was to increase Hopkins's potential sentence from 70-87 months to 121-151 months. At sentencing, Hopkins objected to the judge's determination of the amount of money in dispute and therefore objected to the sentence enhancement, but he did not specifically make a Sixth Amendment claim. Nonetheless, this court reviews sentencing enhancements in violation of the Sixth Amendment under the plain error rule. *United States v. Oliver*, 397 F.3d 369, 380-81 (6th Cir. 2005). Because it is unclear whether the district court treated the Sentencing Guidelines as advisory rather than mandatory, *United States v. Barnett*, 398 F.3d 516, 527-28 (6th Cir. 2005), we remand this case to the district

No. 03-2311

United States v. Hopkins

court for resentencing in a manner consistent with *United States v. Booker*, 543 U.S. ___, 125 S. Ct.

738 (2005).

**IV**

For reasons stated above, we **AFFIRM** the district court's jury instruction and **REMAND**

for resentencing pursuant to *Barnett*.