RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee,*

      *v.*

JAFARI T. MOORE,

          *Defendant-Appellant.*

Nos. 12-6437/6438

> Appeal from the United States District Court
> for the Eastern District of Kentucky at Lexington.
> No. 5:12-cr-00089-1—Joseph M. Hood, District Judge.

Argued: October 9, 2013

Decided and Filed:  October 23, 2013

Before: KEITH and SUTTON, Circuit Judges; BLACK, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert L. Abell, Lexington, Kentucky, for Appellant.  Elisabeth A. Sigler, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Robert L. Abell, Lexington, Kentucky, for Appellant.  Charles P. Wisdom, Jr., Robert M. Duncan, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

_____

## OPINION
_____

SUTTON, Circuit Judge.  A federal jury convicted Jafari Moore of possession of a firearm by a convicted felon.  His principal claim on appeal is that the district court

_____

[*] The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

1

should have instructed the jury about his affirmative defense that he possessed the gun out of necessity. We affirm.

I.

Jafari Moore and three friends wound up at Diva's, a strip club in Lexington, at the tail end of a night out. As the club closed, Moore followed his friends outside through the parking lot and toward their silver Camry.

Moore claims that he noticed a nearby SUV needed a jump start and walked over to help. He found William Layland standing next to the SUV and James Michael King sitting in the driver's seat. Moore and Layland pushed the SUV so that it faced outwards and could be jump-started.

King hopped out, and Moore spotted a pistol sticking out of his waistband. Moore turned around. He heard a click, turned back around and saw King's pistol pointed straight at him. Moore "went after the gun," and the pistol went off a few times as the men wrestled for it. R.60 at 179. One shot (or a piece of concrete dislodged by a shot) hit King, who dropped the pistol. Moore grabbed the pistol, ran, jumped into the backseat of the Camry and threw the gun at his feet as the car drove away.

Three witnesses contradicted Moore's version of what happened, and one supported it. Joshua Evans, the bouncer at Diva's, was escorting dancers out of the club when he saw King's car with the hood propped open. Evans asked if King needed help, and he told one of the dancers to move her car into position to jump-start King's car. Then he saw Moore run up, grab a gun from King's belt and begin firing at King's car. Evans ran for cover, at which point Moore shot at him. Evans saw Moore get in a silver Camry, and he called the police as the car drove off. King and Layland, both called as defense witnesses, likewise testified that Moore came up to King, grabbed the pistol from King's waistband and shot at King. Moore's three friends, also called as defense witnesses, were in the car waiting for Moore and thus did not see what happened in the parking lot. Ricky Strode, who was in the parking lot collecting cans to exchange for cash, supported Moore's version of the events.

While patrolling the area, Officer Raymond Terry heard an "attempt to locate" call for a silver Camry with a male occupant wearing a blue shirt and blue hat. He saw a silver Camry and stopped it. Moore was in the backseat wearing a blue shirt and a blue hat. The call mentioned the shooting at Diva's, prompting Officer Terry to stay outside the Camry for his own safety. He told the four passengers to keep their hands where he could see them and waited for backup to arrive. Once the other officers arrived, they removed the passengers one at a time—first the two women, then Moore, then the driver. The officers searched the Camry and found the pistol on the backseat floorboard where Moore had been sitting. At some point, Evans was brought to the scene of the stop, and he identified Moore as the shooter he had seen in the parking lot.

Moore said nothing when the officers found the pistol in the backseat, and he claims the officers did not ask him about the pistol. Two of Moore's friends testified that the officers asked about the pistol and that none of them said anything in response. The third passenger was too intoxicated at the time to remember. Moore was placed under arrest when he arrived at the station. He denied being at Diva's, and he denied knowing anything about the pistol.

Moore was charged with being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). At trial he claimed that he possessed the pistol in self-defense. The district court denied Moore an instruction on that affirmative defense, and the jury found him guilty. Moore received a 120-month prison term.

The events at Diva's took place during Moore's three-year term of supervised release for a prior felon-in-possession offense. One condition of Moore's supervised release was that he not commit another federal or state crime. The district court found that Moore's actions during the fight with King amounted to assault and wanton endangerment, both state crimes. The district court as a result revoked Moore's term of supervised release and imposed a concurrent twenty-four month term of imprisonment.

II.

Moore primarily challenges the district court's denial of his necessity defense. Section 922(g)(1) does not mention this common law defense. But many federal courts, including ours, have "engrafted the defense onto the statute" on the assumption that Congress enacts criminal statues against a "common-law backdrop." *United States v. Tate*, 117 F. App'x 394, 396 (6th Cir. 2004); *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir. 1990); *see also United States v. Mooney*, 497 F.3d 397, 403 (4th Cir. 2007) (collecting cases). Available only in "rare situations," the defense contains five conjunctive requirements: The defendant must have (1) reasonably feared death or serious injury from an imminent threat, (2) not recklessly placed himself in the path of that threat, (3) had no reasonable alternative to possession, (4) reasonably believed that possession would avert the threat and (5) maintained possession only as long as necessary to avoid the threat. *See Singleton*, 902 F.2d at 472–73.

The district court refused to give the instruction because the evidence introduced at trial failed as a matter of law to establish the defense. *See United States v. Bailey*, 444 U.S. 394, 415 (1980). For purposes of this appeal, the parties agree that Moore presented sufficient evidence to establish the first four elements of the defense; they dispute only the fifth. As to that element, a defendant must show that he gave up possession as soon after the harm ended as possible. A defendant may do so by turning the firearm over to someone else, ideally the police who are best suited to dispose of the firearm, or by leaving the firearm somewhere else. *See United States v. Kemp*, 546 F.3d 759, 766 (6th Cir. 2008); *Singleton*, 902 F.2d at 473. If a police officer happens to find the defendant first, the defendant must hand the firearm over to the officer, as the officer's presence gives the defendant an immediate chance to give up possession. *See United States v. Ridner*, 512 F.3d 846, 851–52 (6th Cir. 2008). A defendant who fails to take advantage of that chance maintains possession for longer than "absolutely necessary." *Singleton*, 902 F.2d at 473.

Even if we accept Moore's version of events, these precedents close the door on his necessity defense. Moore knew he was a convicted felon, and he knew he could not

possess a firearm. Yet he refused serial opportunities to hand over the gun. He did not leave the weapon at the scene as his car drove off. He did not give the gun to one of the other passengers when he entered the car. He did not call the police from the car. He did not ask his friend to drive him to the police station so he could turn over the pistol. He did not give up possession of the pistol when Officer Terry stopped the car and stood outside waiting for backup. And he did not give up possession when the officers removed him from the car. A defendant cannot satisfy this requirement if he kept possession of a firearm "until the police stopped his vehicle and took the gun away." *Kemp*, 546 F.3d at 766. Just so here.

*United States v. Newcomb*, 6 F.3d 1129 (6th Cir. 1993), does not help Moore. Newcomb was at his girlfriend's apartment when her son Louis ran out of the apartment with a gun and threatened to kill someone. Newcomb chased Louis down an alley, took the ammunition out of the gun and placed the shells in his pocket. Undeterred, Louis said he would find another gun and ran off. Newcomb gave chase but lost Louis. As Newcomb returned to the alley, a police officer patrolling the area stopped him. The officer patted him down, found the ammunition and arrested him. *Id.* at 1131. Newcomb possessed the ammunition for "only moments after" Louis ran off, which was enough evidence "that he possessed the ammunition only for the duration of the emergency situation" to support a necessity instruction. *Id.* at 1138. Moore's possession lasted longer than mere "moments" after the threat ended. As soon as the car pulled out of the Diva's parking lot, any alleged threat from King had ended, giving Moore no reason to possess the pistol any longer. Unlike Newcomb, Moore passed up several opportunities to give up possession of the pistol.

Moore adds that his continued possession was reasonable because he had just been in a fight for his life and was "kind of shocked." R.60 at 184. Yet this requirement is an objective one, focused only on whether the defendant can "show that he did not maintain possession any longer than absolutely necessary." *Singleton*, 902 F.2d at 473. By the time Officer Terry stopped the car, "the threat had subsided and [Moore] could have handed the [pistol] to the police and explained why he had taken possession of it."

*Ridner*, 512 F.3d at 851. Moore at any rate did not just stay silent. He admitted that he lied to the police at the station about the gun, twice making a conscious decision not to tell the police his version of events. All of this severely undercuts the plausibility of the notion that his failure to turn over the gun amounted to a shock-induced omission.

Moore alternatively argues that, once Officer Terry pulled the Camry over, Moore lost possession of the pistol, excusing his subsequent failure to turn over the pistol after the stop. But a passenger is not immediately divested of his possessions when officers stop the car. He is divested of them when he hands them to someone else or when someone else takes them away from him.

Moore also appeals the exclusion of evidence related to an assault charge against King and the revocation of his term of supervised release for an earlier felon-in-possession offense. Moore concedes that these arguments do not come into play unless he was entitled to a necessity instruction. Because he was not, we need not address them.

III.

For these reasons, we affirm.