IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71720-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JEFFREY SEAN SOWERS, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 29, 2016 |

SCHINDLER, J. — A jury convicted Jeffrey Sean Sowers of domestic violence assault in the third degree of his girlfriend M.G. while armed with a firearm, first degree unlawful possession of a .45 caliber semiautomatic Taurus, and first degree unlawful possession of a Hawk 12 gauge shotgun. Sowers argues the court erred by (1) admitting the recorded statement of M.G. as substantive evidence under ER 801(d)(1)(i), (2) refusing to instruct the jury on the defense of necessity for unlawful possession of the Taurus, and (3) failing to give a unanimity instruction. In the alternative, Sowers claims the court abused its discretion by counting the two convictions of unlawful possession of a firearm in the first degree as part of his offender score. We reject his arguments, and affirm.

## FACTS

At approximately 7:30 p.m. on March 2, 2013, Jeffery Sean Sowers called 911. Sowers told the 911 operator his girlfriend M.G. had a gunshot wound to the "right side." In response to whether the gunshot was "intentional or accidental," Sowers said, "Accidental. . . . There was a gun, it was dropped." Sowers said M.G. was holding the gun when it dropped. M.G. can be heard in the background saying, "I shot myself."

Snohomish County Sheriff Deputy Brandon Lynch, Deputy Matthew Barker, and Deputy Donavan Serrao arrived within minutes of the 911 call. As he approached the front door, Deputy Lynch heard a male voice yelling for help from upstairs.

There is a half-wall at the top of the upstairs hallway. Deputy Lynch went upstairs and saw M.G. on the hallway floor on her left side "rolling around . . . in pain." Sowers was kneeling next to M.G. "holding his hand on her upper right side of her back, kind of just below her right shoulder blade area." Deputy Lynch saw a semiautomatic handgun "behind where she was laying." M.G. told Deputy Lynch she "had the firearm when she was shot." Emergency medical personnel took M.G. to Harborview Medical Center.

Sowers waived his Miranda[1] rights. Sowers told Deputy Serrao that he and M.G. lived together in the house and had been involved in a romantic relationship for approximately two years. Sowers said he had been downstairs cleaning his leather jackets and M.G. was upstairs. Sowers said he "heard the gunshot, he heard her call out for him. And he went upstairs to check on her and found a gunshot wound and called 911." Sowers said he did not know how it happened. In his written statement,

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

Sowers also states the .45 caliber Taurus was on loan from his friend Aaron Suitor. Sowers signed the written statement under penalty of perjury. Sowers gave the police consent to search the house.

Detective Tedd Betts and Detective Dave Bilyeu entered through the front door and went upstairs. The upstairs bedroom has a large walk-in closet. The .45 caliber semiautomatic Taurus was on the floor near the bathroom.

While Detective Bilyeu took photographs, Detective Betts went back downstairs. Detective Betts found a nylon holster in the living room near a chest of drawers and an ammunition magazine inside the holster. The magazine contained 10 live rounds of .45 caliber "Blazer" ammunition. Detective Betts found a bullet casing from a fired round of .45 caliber Blazer ammunition "next to and partially underneath a pillow that was on the couch" in the living room. Detective Betts found a bullet hole in the upstairs half-wall and a chest of drawers next to the half-wall indicating the bullet was fired from the downstairs living room. Detective Betts believed "[t]he shooter would have been on the bottom floor, in the living room area, shooting toward the top floor where we were standing." The detectives left the house to apply for a search warrant.

In the meantime, Detective Betts and Detective Bilyeu asked Sowers if he was willing to give a recorded statement. Sowers agreed.

Sowers told the detectives he works as a machinist and M.G. is an exotic dancer. Sowers said they "talked about protection and for her to have protection because she's a dancer." Sowers said that approximately two weeks earlier, he got the Taurus handgun "from Aaron and . . . we brought it home." Sowers cleaned the gun and taught M.G. how to "use it. . . . I've showed her, you know, how to scrub the barrel, how to, you

know, oil it, . . . wipe it down, . . . how to load the magazine." Sowers admitted he "shot the gun" in the woods but "never . . . in the house." Sowers said the gun was "normally kept . . . wherever [M.G.] leaves it" but "I've moved it, I've put it on top of the dresser, . . . on the shelves in the closet. . . . I see it out laying around, I move it."

Sowers told the detectives he was downstairs and had just finished cleaning his leather jackets when "[I] heard the gunshot and I turned around and ran upstairs and [M.G.] was on the floor squirming and screaming." M.G. did not say "how it happened." Sowers "went into a panic" and called 911. According to Sowers, the gun was on the floor nearby and he never "found out how she got shot." Sowers insisted he had "no idea how she was shot."

Detective Betts told Sowers "we found a bullet hole" and "the shell casing" and "it didn't happen the way you explained it, . . . it's a physical impossibility." Detective Betts said the evidence they found showed the gun was fired from downstairs while M.G. was upstairs and asked Sowers to tell them what really happened. Sowers said, "I'm gonna stick with my statement" and told the detectives to talk to M.G.

The detectives returned to the house after obtaining the search warrant. The Taurus contained 9 rounds of .45 caliber Blazer ammunition. The large walk-in closet in the upstairs bedroom contained women's clothing on the right and men's clothing and a dresser on the left. On the left side of the closet between the dresser and the wall, Detective Betts found a soft firearm case that contained a Hawk 12 gauge shotgun. On a shelf directly above the shotgun, the detectives found a military-style ammunition box containing 12 rounds of shotgun ammunition, 68 rounds of .45 caliber Blazer ammunition, a storage box for the Taurus, and gun cleaning supplies. Detective Betts

found a black laptop case on the left-hand side of the closet that contained documents addressed to Sowers and an application Sowers had completed for a concealed weapon license.

On March 5, Detective Betts went to Harborview to talk to M.G. M.G. was "groggy" and "drifting in and out" of sleep. Detective Betts decided to return "when she was more alert."

On March 7, M.G. called Detective Betts and asked him to "visit her to take her statement." Detective Betts and Detective Bilyeu went to Harborview the next day. M.G. was "alert, . . . tracking and answering questions." M.G. told the detectives that she "was twirling a gun on her finger," that she "bumped into a Buddha statue," and that the gun fell and discharged and the bullet "hit her in the back." Detective Betts told M.G. her explanation "was a physical impossibility."

> [I] [e]xplained to her that it was a physical impossibility for the gun to have discharged upstairs in her presence, since we found the casing downstairs on the couch and a bullet hole through the wall, apparently leading from downstairs to upstairs.

M.G. said she did not "want to see Mr. Sowers go to prison." Detective Betts told her they would "be happy to take her statement" but they "weren't going to entertain any lies." M.G. agreed to give a recorded statement.

In the recorded statement, M.G. says she has been battling a methamphetamine addiction for approximately 20 years but had been successful during her 2-year relationship with Sowers. M.G. described her relationship with Sowers as "good. Off and on we've had our rollercoaster rides. Uh, the only offs was my, uh, drug use has affected, um, our confrontations and stuff."

5

M.G. said Sowers got her the Taurus a month or two before because she did not feel safe in the house, "He personally got that gun for me because I was not—I didn't feel safe in that house." M.G. said the Taurus was normally kept "in a holster, but he doesn't wear it . . . , he was gonna fix it and alter it. Um, he has one, um, we just kind of keep it in the box." She said the "only time we . . . use that laser is to play with our dog." M.G. said the shotgun belonged to her daughter and it had been in her possession for about a year.

M.G. said she relapsed "the day of the accident." M.G. said at one point while she was downstairs in the living room, she had the gun. "I just picked it up and, you know, and just you know played with it for a little bit." M.G. said she left the gun on a table before she went upstairs "because I think he was cleaning it." M.G. said that while she was upstairs, she was "stomping around acting like a little child" to get his attention and Sowers told her to "shut up."

> I was stomping around acting like a little child um seeking attention for attention, um, interrogating him and and subliminal, uh, messages by not really throwing—kinda throwing stuff in his face—I don't remember the remarks I was saying but I just know how I am. . . . I pretty much was pushing his buttons . . . . I was gettin' my clothes ready and getting ready to put my pajamas on . . . but I was screaming the whole time and he, he was just like, "just shut up. . . . Just stop."

M.G. was in the upstairs hallway and yelling at Sowers. "There was words being exchanged. And he was like, 'Quiet!' you know and I, and I was like, just kept on going and going and going." M.G. said that while walking to the bedroom, Sowers fired a shot from the Taurus to "alert me or wake me up."

> I was walking back towards my bedroom, he didn't know. You can't see, uh, up in the um where the staircase is. If you look at it, you can't really see past— . . . through there. . . . And he's done this, um, where we're out

in the woods and he'll shoot up in the air. . . . I think when that shot was fired it was to kinda wake—alert me or wake me up.

In response to the question, "Is there anything else that you would like to . . . include in this statement that we haven't asked you?" M.G. said, "I feel this isn't a total accident," but Sowers "is the person for me. I love him. I love him very much. . . . I don't want anything to happen to him."

M.G. states at the end of the recorded statement that she certifies under the penalty of perjury that the statements she made are true.

The State charged Sowers with domestic violence intentional assault of M.G. with a firearm in the second degree, count I; domestic violence criminal negligence assault in the third degree with a firearm, count II; unlawful possession of the Taurus .45 caliber semiautomatic handgun in the first degree, count III; and unlawful possession of the Hawk 12 gauge shotgun in the first degree, count IV.

At the beginning of trial, Sowers addressed the admission of M.G.'s recorded statement. Sowers argued ER 801(d)(1)(i) applied to only a written not a recorded statement and M.G. had "no opportunity to review the statement." Sowers also argued the recorded statement did not "meet the standards under [ER] 801."

The court rejected the argument that ER 801(d)(1)(i) applies to only a written statement but reserved ruling on the admission of the recorded statement.

> [I]t strikes me that where you often have a circumstance where police interview someone, and the officers then write out a written statement and have a witness sign it under penalty of perjury, the likelihood that the statement may be inaccurate or incomplete is heightened as compared to a recorded statement — although I suppose there could be challenges to tampering with the recorded statement.
> That's certainly less likely than a written statement suffering from errors or information that's not, you know, included in the written statement. Even though it may have been provided orally to the officers

who wrote the statement, that's less of a concern where the witness himself or herself writes out the statement.

But it strikes me that there's no inherent flaw with a recorded statement in terms of the reliability aspects that the rule is focused on.

So presumptively, if the witness testifies as the State has indicated she may in its brief, I would anticipate allowing the contradictory statements to be offered through playing the audio recording. But I will reserve a final ruling on that so I can revisit the rule.

The court read the charges the State filed against Sowers to the jury before opening statements. The court instructed the jury on the presumption of innocence, the State's burden of proof, and the duty to determine the facts from the evidence produced in court.

In opening statement, the defense asserted the evidence would show the shooting was accidental and because Sowers is a convicted felon, he did not tell the police what actually happened.

This is an accidental shooting by someone who couldn't tell, because he was afraid because he was a convicted felon. And if he tells them he touched that gun, he knows the jig is up.

I can't tell. With tears in his eyes, he said just that story. Go ask [M.G.]. That's the evidence that you're going to hear. And that's consistent with everything that Mr. — that you heard from the deputy prosecuting attorney. Nothing inconsistent.

First words out of his mouth to someone who asked him what happened was, An accident. It was an accidental shooting. It was accidental. That's this case.

The State called a number of witnesses to testify at trial including M.G., Deputy Lynch, Deputy Serrao, Detective Betts, Detective Bilyeu, and forensic experts. The court also admitted into evidence the 911 call and Sowers' written statement and recorded statement.

M.G. testified she acquired the Hawk shotgun and the Taurus handgun from friends for her protection. M.G. said Sowers played no role in obtaining the firearms.

8

M.G. testified that a couple of weeks before March 2, she contemplated killing herself with the Hawk shotgun.

M.G. testified that on March 2, she was high on methamphetamine. "I was out of my mind. I was whacked out. There was all kinds of things going on in my head." M.G. said she used the laser sight on the Taurus handgun to play with the dog in the living room. M.G. said she "tossed" the Taurus handgun on a table in the living room and went upstairs. "Next thing you know, I heard a big bang." M.G. denied Sowers ever told her to "be quiet" or "shut up" that night. M.G. testified Sowers never fired a "warning shot[ ]" to either "quiet things down" or as a "wake up shot." M.G. said she did not remember giving a recorded statement to Detective Betts.

The court ruled the recorded statement M.G. gave to Detective Betts met the requirements of ER 801(d)(1)(i) and admitted the statement as substantive evidence. The State played the recorded statement for the jury.

Washington State Patrol Crime Laboratory (WSPCL) firearm and toolmark forensic scientist Brian Smelser testified about the safety features of the .45 caliber semiautomatic Taurus handgun. Smelser testified the Taurus would not fire if dropped. Smelser testified the shell casing found on the living room couch had been fired from the Taurus handgun.

WSPCL DNA[2] forensic scientist Lisa Yoshida tested the Taurus handgun and Hawk shotgun for DNA. Yoshida determined the DNA from Sowers matched the dominant male profile on the Hawk shotgun. Yoshida testified an "estimated probability

---

[2] Deoxyribonucleic acid.

9

of selecting an unrelated individual at random from the U.S. population with a matching profile is 1 in 27 quintillion."

Yoshida testified the results of DNA testing on the Taurus handgun showed a mixture of "at least four individuals, including male and female" DNA. "[D]ue to the complexity of the mixture," Yoshida could not include or exclude Sowers as a substantial DNA contributor.[3]

Shooting scene reconstruction expert Detective Brian Wells testified. After examining the path of the bullet hole through the upstairs half-wall and the chest of drawers, the trajectory showed the shooter had been downstairs near the living room couch.

M.G. testified again on behalf of the defense. M.G. said she was in the living room using the laser sight on the Taurus to play with the dog. M.G. testified Sowers had been "frustrated and irritated" with her but denied he yelled at her or told her to "shut up." M.G. said that a week before, she had been "high" and "had a shotgun, my shotgun, to my head and was sitting in the bathtub."

Sowers testified. Sowers said he met M.G. "at an [Alcoholics Anonymous] meeting in Renton." Sowers described M.G. as a "managing addict." Sowers admitted he used drugs in the past and had been convicted of felonies. Sowers testified that "[s]obriety is the most important thing to me." Sowers said he had not used drugs or alcohol since May 23, 2008.

Sowers testified M.G. was an exotic dancer and she wanted to get a handgun to protect herself. Sowers said he lied to the police when he told Detective Betts he

---

[3] Yoshida testified there was no "indication of any sort of dog DNA" on the Taurus handgun.

"bought the gun from Aaron Suitor, [he] brought it into the house." Sowers said he only "arranged" for M.G. to meet with his friend to purchase a gun and he "introduced [M.G.] to Aaron to purchase the weapon." Sowers testified he gave M.G. the money to buy the Taurus. Sowers admitted the paperwork found in the laptop case in the walk-in closet belonged to him. Sowers admitted he filled out the "concealed pistol license application." Sowers later learned his prior convictions prevented him from obtaining the permit.

Sowers testified that in late February 2013, he found the Hawk shotgun on the bathroom floor and M.G. told him she considered using the shotgun to harm herself. Sowers testified he "dismantled," "cleaned," and put the Hawk shotgun away and told M.G. she needed to remove the weapons from the house.

> In my mind, at that point, there's no question the weapons need to leave the house. We — knowing that I can't possess, I can't own any firearms, I — I basically, made her agree to remove them. And she promised me that she would.

Sowers testified that when M.G. returned home the afternoon of March 2, she told him she had "gotten high" and wanted to go out. Sowers did not want to go out in public with her and "told her to just go get some rest."

> . . . I assumed that she had been up for quite some time. She was very erratic; her behavior was very erratic.
>
> Q    Did — did she express a desire to go outside or go do anything or —
>
> A    Yeah. She wanted to go do stuff, and I didn't — I didn't want — it's — I'm sorry, but it's embarrassing. It's embarrassing because of the behavior. I didn't want to go out in public.

But instead of going upstairs to the bedroom, Sowers said M.G. started using the laser sight on the Taurus handgun to play with the dog in the living room. Sowers "told her to put the gun down" and she "threw" the gun "onto the table." M.G. "stormed off.

11

She wanted me to show her how to clean the gun. And I said, No. There's not going to be cleaning of the gun. There isn't going to be anything to do with the gun."

Sowers testified the dog was "[n]ipping or trying to bite the light at the end of the laser, on the end of the gun, I walked over and I picked up the gun and attempted to turn the laser off." Sowers admitted his finger "was on the trigger" when he picked up the gun.

> Q    I'd also like to ask you, I want to go back to the moment where the dog grabbed your hand. O.K.
>     So, back to that. Do you remember where your finger was on —
> A    On the trigger.
> Q    It was on the trigger?
> A    Yes.
> Q    And why was it on the trigger?
> A    That's just how I picked it up.
> Q    Just happened to grab it that particular way?
> A    Yes. That is how I picked up the gun.

Sowers testified the dog "jumped up, and as [the dog] was clamping down on my hand, I jerked and squeezed and a round went off." He then heard M.G. "yell my name and I ran upstairs. And I dialed 911."

Sowers stipulated he has a prior conviction for assault in the second degree. The court also instructed the jury that Sowers had previously been convicted of a serious offense.

In closing argument, the prosecutor asserted Sowers was guilty of intentional assault in the second degree. The prosecutor argued the evidence showed Sowers "deliberately and intentionally shot her" with the intent to scare M.G. and "recklessly inflicted substantial bodily harm." The prosecutor argued that if the jury believed the testimony Sowers gave at trial, he was guilty of negligent assault in the third degree with

a firearm. "[E]ven by his own testimony, he's guilty of third degree assault while armed with a firearm."

The prosecutor asserted Sowers was guilty of unlawful possession of the Taurus in the first degree because he admitted picking up the Taurus and shooting it. The prosecutor argued Sowers was guilty of unlawful possession of the Hawk shotgun because he admitted cleaning it and the DNA on the shotgun showed "actual possession." The prosecutor also argued the evidence established constructive possession of the Taurus handgun and Hawk shotgun.

> When he picked up the gun, the Taurus gun, he is in possession of it. The DNA on the shotgun tells us he was in actual possession of that weapon as well. But it's also true that he was in constructive possession of both weapons. They were both in his home. Everything associated with both weapons was in his side of the closet. Ammunition for both weapons, that carry case for the pistol is in his side of the closet with his paperwork. The shotgun is in the corner. Again, all in close proximity to the other items.

Defense counsel conceded the statements Sowers gave to the police were "inconsistent with the physical evidence that Detective Betts had come with just prior to going to that car. No question about that." The attorney argued Sowers' testimony at the trial was credible and he was not guilty of assault in the second degree.

> Mr. Sowers wanted the opportunity to tell you his version of events. He chose to elect trial as the ultimate decisionmaker. He chose 12 jurors and not 12 police officers. . . . His fate is on you that you will follow your charge.
> . . . Jeff Sowers was comfortable coming into court and telling his version of events. And some of those didn't exactly help him, you know.
> Jeff Sowers admitted to previously cleaning that weapon consistent with the DNA evidence. He admitted that. There's no question about that. He also told a version of events consistent with the very sophisticated physical evidence that was presented to you in this case. There's nothing inconsistent.

13

Defense counsel argued M.G. was not credible.

> Now, I realize in assessing credibility of the witnesses, we do have [M.G.]'s testimony which is to anyone who has practiced in the course, it was unique. The Court gave both counsel leeway in how we could try to help the witness give answers to the questions that could be admitted here. And — and what you saw was the effect of 20 years of methamphetamine use, how it just ravages, and that is sad.

The jury found Sowers not guilty of intentional assault in the second degree. The jury found Sowers guilty of domestic violence assault in the third degree with a firearm. By special verdict, the jury found Sowers was armed with a firearm during the assault and he and M.G. were members of the household. The jury found Sowers guilty of the two counts of unlawful possession of a firearm in the first degree.

## ANALYSIS

### Admission of Recorded Statement

Sowers claims the court abused its discretion by admitting the recorded statement M.G. gave to the police as substantive evidence under ER 801(d)(1)(i). Sowers asserts the statement did not meet minimum guarantees of truthfulness.

ER 801(d)(1) provides that an out-of-court statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is (i) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.

ER 801(d)(1)(i) permits the admission of a witness's prior inconsistent statement as substantive evidence if the statement is "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding." An "other proceeding" includes statements made to investigating police officers. State v. Smith, 97 Wn.2d 856, 862,

651 P.2d 207 (1982); State v. Otton, ___ Wn.2d ___, 374 P.3d 1108, 1111-12 (2016).

In Smith, the court held, "We do not interpret the rule to always exclude or always admit . . . . The purposes of the rule and the facts of each case must be analyzed. In determining whether evidence should be admitted, reliability is the key." Smith, 97 Wn.2d at 861.[4]

We review the decision to admit or exclude evidence for abuse of discretion. State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). A court abuses its discretion only if "no reasonable person would take the view adopted by the trial court." State v. Castellanos, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997).

In determining the reliability of a prior inconsistent statement under ER 801(d)(1)(i), the court considers four factors:

> "(1) [W]hether the witness voluntarily made the statement, (2) whether there were minimal guaranties of truthfulness, (3) whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause, and (4) whether the witness was subject to cross examination when giving the subsequent inconsistent statement."

Otton, 374 P.3d at 1111 (quoting State v. Thach, 126 Wn. App. 297, 308, 106 P.3d 782 (2005)).

Sowers claims that because the recorded statement was not made under oath, the court erred in admitting the statement as an exhibit under ER 801(d)(1)(i). The record does not support his argument.

---

[4] Footnotes omitted.

At the beginning of the recorded statement, Detective Betts states the date and time of the recorded statement.

> This is the statement of [M.G.] . . . . Today's date is March 8, 2013. The time now is 12:17 hours. I'm Detective Betts with the Snohomish County Sheriff's Office and this statement is being recorded at Harborview Medical Center.

M.G then gives her consent to a recorded statement.

> DETECTIVE BETTS:  [M.G.], do you understand this statement is being recorded?
>
> M.G.:  Yes, I do.
>
> DETECTIVE BETTS:  And do I have your permission to do this?
>
> M.G.:  Yes.

At the end of the recorded statement, M.G. declares under the penalty of perjury that the facts in her statement are true and Detective Betts signs as a witness.

> DETECTIVE BETTS:  I'm gonna be, uh, ending this statement now. Uh, do you certify or declare under penalty of perjury under the laws of the state of Washington that the facts stated on this tape are true and correct to the best of your knowledge. And that this statement has been made freely, voluntarily, and without threats or promises of any kind. Would you like me to repeat that?
>
> M.G.:  I — I don't understand what that's saying.
>
> DETECTIVE BETTS:  Okay let me repeat it to you again slowly. Do you certify or declare under penalty of perjury under the laws of the state of Washington that the facts that you stated on this tape are true and correct?
>
> M.G.:  Yeah.
>
> DETECTIVE BETTS:  To the best of your knowledge?
>
> M.G.:  Yeah.
>
> DETECTIVE BETTS:  And that this statement was made freely, voluntarily, and without threats or promises of any kind.

M.G.:     Um.  I understand that.

M.G. also signed a document certifying the statements on the recording were made under the penalty of perjury.  Detective Betts asks M.G. to "go ahead and sign down here please where it says signature."  After M.G. signs, Detective Betts signs as a witness, stating, "OK, I'll sign underneath your name."[5]

The statement complied with the requirements of RCW 9A.72.085.  RCW 9A.72.085[6] states, in pertinent part:

> (1)  Whenever, under any law of this state or under any rule, order, or requirement made under the law of this state, any matter in an official proceeding is required or permitted to be supported, evidenced, established, or proved by a person's sworn written statement, declaration, verification, certificate, oath, or affidavit, the matter may with like force and effect be supported, evidenced, established, or proved in the official proceeding by an unsworn written statement, declaration, verification, or certificate, which:
>          (a)  Recites that it is certified or declared by the person to be true under penalty of perjury;
>          (b)  Is subscribed by the person;
>          (c)  States the date and place of its execution; and
>          (d)  States that it is so certified or declared under the laws of the state of Washington.

State v. McComas, 186 Wn. App. 307, 345 P.3d 36 (2015), is distinguishable.  In McComas, the court concluded the recorded statement "did not qualify as a sworn statement under RCW 9A.72.085" because "[t]he police transcribed her oral statement, but she did not review, sign, and date the transcription."  McComas, 186 Wn. App. at 319.  Unlike in McComas, the recorded statement was not transcribed.  And unlike in

---

[5] The listener can hear the scratching sound of a pen or pencil on paper as M.G. and Detective Betts sign the statement.

[6] We note the legislature amended RCW 9A.72.085 in 2014.  LAWS OF 2014, ch. 93, § 4.  Because the amendments did not change the pertinent language quoted here, we cite the current version of the statute.

McComas, the recorded statement in this case met the requirement of reliability under ER 801(d)(1)(i). See Smith, 97 Wn.2d at 861-62.

The other cases Sowers cites, State v. Sua, 115 Wn. App. 29, 60 P.3d 1234 (2003), and State v. Nieto, 119 Wn. App. 157, 79 P.3d 473 (2003), are also inapposite. In Sua, the declarants did not attest to the truth of the statements under the penalty of perjury. Sua, 115 Wn. App. at 33. In Nieto, the language of the oath was ambiguous. Nieto, 119 Wn. App. at 161-62. Here, unlike in those cases, the recorded statement reflects the date and time the statement was taken and M.G. attests to the truth of the statement under the penalty of perjury.

For the first time on appeal and without citation to authority, Sowers claims the oath should be given at the beginning of the recording and M.G. should have been given the opportunity to review the statement before acknowledging it was truthful. But below, Sowers conceded the "language that the detective used at the end of the statement . . . is the type of language that is accepted under [ER] 801."

We conclude the record establishes the recorded statement was made under oath subject to the penalty of perjury and complied with the requirements of RCW 9A.72.085. The court did not abuse its discretion in admitting the prior inconsistent statements of M.G. under ER 801(d)(1)(i).

In any event, we conclude that within reasonable probability, the jury would have reached the same verdict even without the recorded statement of M.G. Sowers admitted he fired the semiautomatic weapon on March 2 and the jury convicted him of the lesser included offense of third degree assault, criminal negligence. Sowers admitted he cleaned and dismantled the shotgun the week before and his DNA was on

the shotgun. The State also presented unrebutted evidence of his constructive possession and control of the Taurus handgun and Hawk shotgun.

Necessity Jury Instruction

Sowers contends the court violated his constitutional right to present a defense by refusing to give his proposed instruction on the defense of necessity for unlawful possession of the Taurus in the first degree.[7]

A defendant can assert the affirmative defense of necessity to the charge of unlawful possession of a firearm in the first degree. State v. Jeffrey, 77 Wn. App. 222, 226, 889 P.2d 956 (1995); State v. Stockton, 91 Wn. App. 35, 44, 955 P.2d 805 (1998). But the defendant must demonstrate by a preponderance of the evidence:

> (1) He was under unlawful and present threat of death or serious injury, (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct, (3) he had no reasonable alternative, and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

Jeffrey, 77 Wn. App. at 225.

We review a trial court's refusal to give a proposed jury instruction based on a factual dispute for abuse of discretion. State v. Brightman, 155 Wn.2d 506, 519, 122 P.3d 150 (2005) (citing State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998)).

Below, Sowers argued the court should give a necessity defense instruction because of his "measured response" to the threat.

> I think the elements of necessity are here because we had a measured response, we have — what was the threat was touching the gun to shut off the laser sight or get the bullets out of the gun. I think that's a response, and I think necessity should be applied.

---

[7] Sowers did not designate his proposed necessity defense instruction on appeal. RAP 9.6(b)(1)(G) states, "The clerk's papers shall include, at a minimum: . . . any jury instruction given or refused that presents an issue on appeal."

The court ruled insufficient evidence supported giving a necessity defense instruction.

> [T]here's insufficient evidence to support a necessity defense for possession of the firearm. Mr. Sowers testified that he picked up the weapon to turn the laser off. It wasn't his testimony that he picked up the gun to get it out of the house or to be sure that the safety was on or to clear the weapon of any possible live rounds.
> And he also didn't testify to any concern that the dog would fire the gun. The evidence from his testimony was that the dog was snapping at some point in front of the gun, but never came in contact with the weapon itself.
> If there was a lawful necessity for taking possession of the handgun, then there would also need to be concomitant evidence that there was no reasonable alternative to taking possession.
> Mr. Sowers knew that he was not allowed to possess the firearm. [M.G.], regardless of whatever her condition or thoughts may have been, was not near the weapon but had gone upstairs. There's no reason that he could not have called a neighbor, 911, or any first responder, and asked that they take possession of the weapon.

United States v. Newcomb, 6 F.3d 1129 (6th Cir. 1993), does not support Sowers' argument that the court erred in refusing to instruct the jury on the defense of necessity. In Newcomb, the defendant was at his girlfriend's apartment when her son ran out of the apartment with a gun threatening to kill someone. Newcomb, 6 F.3d at 1131. The defendant chased the son down an alley, took the ammunition out of the gun, and placed the shells in his pocket. The son said he would find another gun and ran off. Newcomb, 6 F.3d at 1131. The defendant chased after him but lost him. When the defendant returned to the alley, a police officer patrolling the area stopped him, found the ammunition, and arrested him. Newcomb, 6 F.3d at 1131. The court concluded the defendant possessed the ammunition for "only moments after" the son ran off and there was enough evidence "that he possessed the ammunition only for the duration of the emergency situation" to support a necessity instruction. Newcomb, 6

F.3d at 1138. Unlike in <u>Newcomb</u>, according to Sowers' testimony, M.G. left the living room and was upstairs when he picked up the gun. Sowers also admitted he could have gotten rid of the Taurus before March 2.

The record supports the court's refusal to give a necessity defense instruction. Sowers testified he picked up the Taurus handgun to turn off the laser sight, not because of a present threat of harm.

> Q    Mr. Sowers, did [M.G.] eventually put the gun down?
> A    Yeah. She tossed it onto the table, onto this table right here.
> Q    Was the laser sight still on?
> A    Yes.
>
> . . . .
>
> Q    And what did you do next?
> A    I walked over and I picked up the gun and attempted to turn the laser off.

Sowers acknowledged he previously considered calling a friend to take the firearms out of the house.

> Q    . . . So it's just before the shooting occurs that you decided it was time to get rid of the guns; is that right?
> A    No. I made that decision earlier, and [M.G.] had agreed with me.
> Q    You were going to rely on her to get rid of them?
> A    Yes.
> Q    I see. Did you consider calling a friend, perhaps, and just having him come over and get the guns?
> A    Yeah. We discussed that, sure.
> Q    Why didn't you decide on that course of action?
> A    I don't know why we didn't. She assured me that she would get rid of them.

<u>Unanimity Instruction</u>

For the first time on appeal, Sowers contends the court erred in failing to give a unanimity instruction on the two counts of unlawful possession of a firearm in the first degree. A defendant has a right to a unanimous jury verdict under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington

Constitution. State v. Fisher, 165 Wn.2d 727, 755, 202 P.3d 937 (2009) (citing State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988)). A defendant may be convicted only when a unanimous jury decides the defendant committed the charged crime. State v. Crane, 116 Wn.2d 315, 324-25, 804 P.2d 10 (1991).

As a general rule, an alternative means crime is set forth in a statute defining a "single offense, under which are set forth more than one means by which the offense may be committed." State v. Smith, 159 Wn.2d 778, 784, 154 P.3d 873 (2007). Under State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), if the State presents evidence of multiple distinct acts that could form the basis of one charge, the court must instruct the jury to agree on a specific act. See also State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007); Crane, 116 Wn.2d at 325.

Sowers argues he was entitled to a Petrich instruction because the jury must agree on the act for the two counts of unlawful possession in the first degree of the Taurus and the Hawk shotgun. His argument is without merit. Unlawful possession of a firearm in the first degree is not an alternative means crime. The statute defining the crime of unlawful possession of a firearm does not set forth alternative means.

The amended information charged Sowers with two separate counts of unlawful possession of a firearm in the first degree in violation of RCW 9.41.040(1): possession of the .45 caliber semiautomatic Taurus firearm, count III; and possession of the 12 gauge Hawk shotgun, count IV. The amended information states, in pertinent part:

> COUNT III: UNLAWFUL POSSESSION OF FIREARM IN THE FIRST
> DEGREE, committed as follows: That the defendant, on or about the 2nd
> day of March, 2013, having previously been convicted in this state or
> elsewhere of a serious offense as defined in RCW 9.41.040, to-wit:
> Second Degree Assault, did knowingly own or have in his possession or

22

under his control a firearm, to-wit: Taurus .45 caliber pistol; proscribed by RCW 9.41.040(1), a felony.

COUNT IV: UNLAWFUL POSSESSION OF FIREARM IN THE FIRST DEGREE, committed as follows: That the defendant, on or about the 2nd day of March, 2013, having previously been convicted in this state or elsewhere of a serious offense as defined in RCW 9.41.040, to-wit: Second Degree Assault, did knowingly own or have in his possession or under his control a firearm, to-wit: Hawk 12 gauge shotgun; proscribed by RCW 9.41.040(1), a felony.

The court instructed the jury on the two separate counts of unlawful possession

of a firearm in the first degree. Jury instruction 16 states:

> To convict the defendant of the crime of unlawful possession of a firearm in the first degree, as charged in Count III, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 2nd day of March, 2013, the defendant knowingly had a firearm, to wit: Taurus .45 caliber pistol, in his possession or control;
> (2) That the defendant had previously been convicted of a serious offense; and
> (3) That the possession or control of the firearm occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Jury instruction 17 states:

> To convict the defendant of the crime of unlawful possession of a firearm in the first degree, as charged in Count IV, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 2nd day of March, 2013, the defendant knowingly had a firearm, to wit: Hawk 12 Gauge shotgun, in his possession or control;
> (2) That the defendant had previously been convicted of a serious offense; and
> (3) That the possession or control of the firearm occurred in the State of Washington.

23

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

The jury instruction defining possession as either actual or constructive does not create alternative means of committing the crime of unlawful possession of a firearm in the first degree. Smith, 159 Wn.2d at 785-86. Jury instruction 18 states:

Possession means having a firearm in one's custody or control. It may be either actual or constructive. Actual possession occurs when the item is in the actual physical custody of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is dominion and control over the item.

Proximity alone without proof of dominion and control is insufficient to establish constructive possession. Dominion and control need not be exclusive to support a finding of constructive possession.

In deciding whether the defendant had dominion and control over an item, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the immediate ability to take actual possession of the item, whether the defendant had the capacity to exclude others from possession of the item, and whether the defendant had dominion and control over the premises where the item was located. No single one of these factors necessarily controls your decision.

State v. King, 75 Wn. App. 899, 878 P.2d 466 (1994), is distinguishable. In King, the State charged the defendant with one count of possession of cocaine and there was conflicting evidence of the defendant's possession. King, 75 Wn. App. at 901, 903-04. At trial, the defendant testified the officers planted the cocaine on him. King, 75 Wn. App. at 901-02.

Offender Score

In the alternative, Sowers claims the court erred in calculating his offender score and including the two convictions of unlawful possession of a firearm in the first degree

24

as separate crimes. Sowers asserts the two crimes constitute the "same criminal conduct" and should count as only one offense.

Under RCW 9.94A.589, a sentencing court calculates an offender score by separately counting other prior convictions and current offenses unless one or more of the current offenses encompass the same criminal conduct.[8] "Same criminal conduct" as used in the statute means "two or more crimes that require the same criminal intent . . . are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a).

"Deciding whether crimes involve the same time, place, and victim often involves determinations of fact." State v. Graciano, 176 Wn.2d 531, 536, 295 P.3d 219 (2013). The sentencing court's determination will not be disturbed unless the court abuses its discretion or misapplies the law. Graciano, 176 Wn.2d at 536-37.

The court found the two convictions for unlawful possession of a firearm in the first degree did not constitute the same criminal conduct.

> They're separate weapons, you were in possession of two firearms that you had no business possessing. I don't find that that constitutes the same criminal conduct because those separate weapons happened to have been found or used or possessed in the same residence. . . .
> . . . The [State v. Stockmyer, 136 Wn. App. 212, 148 P.3d 1077 (2006),] decision, I think, is clearer. But I think factually here when you're in possession of separate weapons at separate locations within the home, that does not constitute the same criminal conduct.

---

[8] RCW 9.94A.589(1)(a) provides, in pertinent part:

[W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. . . . . "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

25

The record supports the finding that the two convictions do not meet the "same place" element of RCW 9.94A.589(1)(a).

> Because we narrowly construe the "same place" requirement, we cannot say as a matter of law that [the defendant]'s possession of multiple firearms in these three different locations constituted the same criminal conduct. Moreover, multiple guns in different rooms in felons' homes increase the peril to both law enforcement and the general public in that they provide felons with easier and more ready access to guns in the home, thus increasing the possibility of harm to others.

Stockmyer, 136 Wn. App. at 219. The undisputed evidence establishes the Taurus was in the downstairs living room and the shotgun was in the upstairs walk-in closet.

Statement of Additional Grounds

In his statement of additional grounds, Sowers argues the court erred in denying his CrR 3.6 motion to suppress evidence obtained during the search of the house.[9] We review the court's findings of fact on a motion to suppress for substantial evidence. State v. Mitchell, 190 Wn. App. 919, 924, 361 P.3d 205 (2015) (citing State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006)). We review conclusions of law de novo. Mitchell, 190 Wn. App. at 924 (citing Levy, 156 Wn.2d at 733). We treat unchallenged findings as verities on appeal. State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). The unchallenged findings establish probable cause justified detaining Sowers and Sowers gave the police written consent to search his house. The unchallenged findings state Sowers neither limited the scope of his consent nor attempted to revoke

---

[9] The statement of additional grounds states:

Could the information surrounding my detainment while my home was searched and the search of my home. [sic] I had given them permission to search but they had locked me up in a patrol car, alone, while they conducted their search. The patrol car was parked down the street out of view of my home.

his consent.  The court did not err in denying Sowers' CrR 3.6 motion to suppress evidence.

Affirmed.

WE CONCUR: